**D & D FULLER CATV CONSTRUCTION, INC., a North Carolina corporation, Leamon C. Pace, Sr., and Dixie Pace, Petitioners,**

v.

**Van PACE, Respondent.**

No. 87SC330.

Supreme Court of Colorado, En Banc.

Oct. 2, 1989.

Thomas H. Melton and David P. Voerman, Denver, for petitioners.

Gregory J. Fasing, P.C., Gregory J. Fasing, Denver, for respondent.

Justice ROVIRA delivered the Opinion of the Court.

We granted certiorari to review the judgment of the court of appeals in *Pace v. D & D Fuller CATV Construction,* 748 P.2d 1314 (Colo.App.1987), reversing the trial court's order which held that petitioners lacked sufficient contacts with Colorado to warrant the application of the long-arm statute, § 13–1–124, 6A C.R.S. (1987). Because we conclude that the exercise of jurisdiction over the petitioners satisfies the requirements of the statute and comports with due process of law, we affirm.

## I.

Respondent, Van Pace (mother), married Leamon C. Pace, Jr. (father), on May 26, 1976, in Golden, Colorado. Two children were born of the marriage. In December 1980, she commenced a dissolution of marriage action in Jefferson County District Court, and obtained a temporary restraining order against the father, prohibiting him from going in or near her residence or interfering with their son, Jerritt.

On March 4, 1982, the father kidnapped Jerritt in violation of the Jefferson County District Court order. On March 12, 1982, the court awarded the mother temporary custody of Jerritt. A warrant was issued for the arrest of the father for violation of the custody order and he is still at large.

The mother commenced this action against, among others,[1] Leamon C. Pace, Sr. and Dixie Pace (grandparents), the father's parents, and D & D Fuller CATV Construction, Inc. (D & D Fuller), a North Carolina corporation owned by them.[2] She alleges that the grandparents and D & D Fuller aided and abetted the father in abducting and concealing Jerritt based on the following facts.

The complaint alleges that from September to December 1983, the grandparents had actual physical custody of Jerritt with knowledge that the father had kidnapped Jerritt and that they were keeping him in violation of court custody orders.[3] The grandparents also provided housing for their son during 1982 and 1983, and helped him remain at large by using an alias for Jerritt. Further, the grandparents refused to divulge the whereabouts of their son and grandson to the Sheriff of Craven County, North Carolina, despite their actual knowledge concerning the matter, and they helped their son flee to avoid apprehension by the sheriff. They also warned the father to hide upon learning that the mother's investigator was searching for him in September 1983.

In addition, in June 1982, the grandparents wrote to the Colorado Department of

---

1. In addition to petitioners, the mother also brought suit against the Paul Revere Life Insurance Company (Paul Revere), the father's employer, and Robert L. Carr, an agent for Paul Revere.

2. Leamon C. Pace, Sr., Dixie Pace, and D & D Fuller will hereinafter be referred to as the grandparents and D & D Fuller or collectively as petitioners.

3. In support of this contention, the mother submitted a copy of the permanent orders which had been sent to the grandparents' post office box in North Carolina on August 5, 1982, and a copy of the letter sent to the grandparents' attorney on March 31, 1983, informing him that the mother had sole custody of Jerritt.

Vital Statistics requesting a duplicate copy of Jerritt's Colorado birth certificate with the intent that the duplicate birth certificate would further assist in the kidnapping of Jerritt.[4] In April 1982, the grandparents purchased a 1979 Datsun truck from their son, and attempted to transfer the Colorado title for the truck to North Carolina by letter mailed to the Colorado Department of Revenue, intending that the money from the purchase would assist in the concealment of Jerritt.[5] Moreover, the grandparents assisted in the abduction of Jerritt and prevented the return of Jerritt to his mother.

The complaint also alleges that the grandparents acted as agents for D & D Fuller within the scope of their employment and on behalf of the corporation, and that D & D Fuller participated in, affirmed, ratified, and approved the tortious conduct of its agents. The grandparents, both individually and as agents for D & D Fuller, negotiated checks from the father's Colorado employer and forwarded documents from his employer in order to help their son evade the custody orders. The checks were sent to D & D Fuller's post office box in North Carolina, despite a Jefferson County District Court order prohibiting the father's Colorado employer from sending money to him.[6] D & D Fuller also employed the father in 1983, and failed to make tax deductions from his paychecks in order to avoid detection of his whereabouts through the federal parent locator service.

Based on these allegations, the mother sought relief relying on the theories of tortious interference with the parent-child relationship, as defined by Restatement (Second) of Torts § 700 (1977), and outrageous conduct and prayed for compensatory and exemplary damages. Petitioners moved to dismiss and to quash service of process on the ground that the court lacked personal jurisdiction over them. The trial court dismissed the claim for lack of personal jurisdiction, ruling that there were "insufficient contacts with the State of Colorado to warrant application of the 'Long Arm' Statute for service of process and to obtain jurisdiction."

In conjunction with the mother's motion to reconsider, additional facts were alleged,[7] including: The grandfather was present in Colorado shortly before the kidnapping, where he and the father conspired to prevent the mother from obtaining custody; the grandfather telephoned the mother before and after the abduction and stated that he would do everything in his power to deprive her of her son; the grandmother telephoned the mother and stated that she would never reveal where Jerritt was, that the mother would never see Jerritt again, and that the grandparents would also try to take her other child from her; the grandfather telephoned Jerritt's Colorado physician approximately three months after the abduction and requested copies of Jerritt's medical records; when Jerritt was treated at medical facilities in North Carolina, the D & D Fuller post office box was listed as his address and the grandparents'

4. The mother submitted a copy of a letter from the grandparents' attorney acknowledging that they had requested a copy of Jerritt's birth certificate from Colorado, and a copy of the letter from the grandmother to the Colorado Department of Vital Statistics.

5. The mother submitted a copy of a letter she received from the Motor Vehicle Division of the Colorado Department of Revenue, informing her that a request to transfer title had been received from the petitioners' attorney in North Carolina, but that title would not be transferred pursuant to the temporary restraining order issued in the divorce case. The mother also submitted the letter and bill of sale sent by petitioners' attorney and a copy of the letter sent by the Department of Revenue in response.

6. The mother submitted copies of numerous cancelled checks from Paul Revere to the father which were negotiated at the Wachovia Bank in Raleigh, North Carolina; a copy of the court order which prohibited Paul Revere from making such payments; and Paul Revere's answers to interrogatories which indicate that the checks were sent to the North Carolina post office box.

7. In an offer of proof, the mother's attorney stated that the mother would testify about the statements made to her by the grandparents and would authenticate the exhibits which support the additional allegations.

phone number was listed as his number;[8] and, finally, the grandmother financially assisted her son after the abduction by paying off a loan incurred by him at a Colorado bank.

The trial court denied the motion, finding that "no factual basis was established connecting [petitioners] with torts committed in Colorado." The order was made final pursuant to C.R.C.P. 54(b).[9] The court of appeals reversed, concluding that the factual allegations were sufficient to support the inference that the petitioners' activities constituted a substantial connection with Colorado.

## II.

An assertion of personal jurisdiction over a foreign defendant must satisfy both the requirements of the Colorado long-arm statute, § 13–1–124, 6A C.R.S. (1987), and the requirements of due process of law. *See Le Manufacture Francaise Des Pneumatiques Michelin v. District Court*, 620 P.2d 1040 (Colo.1980). We address these two requirements in turn.

## A.

The mother bases her claim of jurisdiction on the tortious act section of the Colorado long-arm statute, which provides:

> (1) Engaging in any act enumerated in this section by any person, whether or not a resident of the state of Colorado, either in person or by an agent, submits such person and, if a natural person, his personal representative to the jurisdiction of the courts of this state concerning any cause of action arising from:
>
> ....
>
> (b) The commission of a tortious act within this state....

§ 13–1–124, 6A C.R.S. (1987). In enacting this statute, the General Assembly intended to extend the jurisdiction of Colorado courts to the fullest extent permitted by the due process clause of the United States Constitution. *Scheuer v. District Court*, 684 P.2d 249 (Colo.1984); *Fleet Leasing*,

*Inc. v. District Court*, 649 P.2d 1074 (Colo. 1982).

When a non-resident defendant challenges the trial court's exercise of personal jurisdiction, the plaintiff must make a prima facie showing that the trial court may exercise personal jurisdiction over the defendant. *Scheuer*, 684 P.2d at 250–51; *Fleet Leasing*, 649 P.2d at 1078; *Le Manufacture*, 620 P.2d at 1042. To determine whether the plaintiff has established such a prima facie showing of jurisdiction, a court may consider the allegations of the complaint as well as any evidence introduced at a hearing conducted to determine the jurisdictional issue. *Scheuer*, 684 P.2d at 251; *Fleet Leasing*, 649 P.2d at 1078; *Le Manufacture*, 620 P.2d at 1042.

As previously stated, respondent's complaint alleges that petitioners "[i]ntended to assist, and actually assisted the abduction of Jerritt Pace by Leamon C. Pace, Jr., and intended to prevent, and actually prevented, the return of Jerritt to his mother and home in Jefferson County, Colorado." Because this court has not previously done so, we must now decide whether it is a tortious act in Colorado to cause a minor child to leave a parent who is legally entitled to custody of the child when the parent does not consent, or to prevent a child's return to such parent. We conclude that such conduct constitutes a tortious act.

It is criminal conduct in this state to deprive the lawful custodian of custody of a child.

> (1) Any person, including a natural or foster parent, who, knowing that he has no privilege to do so or heedless in that regard, takes or entices any child under the age of eighteen years from the custody of his parents, guardian, or other lawful custodian commits a class 5 felony.
>
> (2) Any parent or other person who violates an order of any district or juvenile court of this state, granting the custody of a child under the age of eighteen

---

8. The mother submitted medical records from the treating physician in North Carolina.

9. Apparently, the mother's suit against Paul Revere and Robert L. Carr is still in progress.

years to any person, agency, or institution, with the intent to deprive the lawful custodian of the custody of a child under the age of eighteen years, commits a class 5 felony.

§ 18-3-304, 8B C.R.S. (1986).

Restatement (Second) of Torts § 700 (1977), provides that "[o]ne who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has ... left him, is subject to liability to the parent." Many jurisdictions have recognized the tort of interference with the parent-child relationship, including *Lloyd v. Loeffler*, 694 F.2d 489 (7th Cir.1982) (applying Wisconsin law); *Bennett v. Bennett*, 682 F.2d 1039 (D.C. Cir.1982) (recognizing the conduct as tortious in the District of Columbia); *Wood v. Wood*, 338 N.W.2d 123 (Iowa 1983); *Spencer v. Terebelo*, 373 So.2d 200, *cert. denied*, 376 So.2d 960 (La.1979); *Kramer v. Leineweber*, 642 S.W.2d 364 (Mo.App.1982); *Plante v. Engel*, 124 N.H. 213, 469 A.2d 1299 (1983); *McGrady v. Rosenbaum*, 62 Misc.2d 182, 308 N.Y.S.2d 181 (1970), *aff'd*, 37 A.D.2d 917, 324 N.Y.S.2d 876 (1971); *LaGrenade v. Gordon*, 46 N.C.App. 329, 264 S.E.2d 757, *appeal dismissed*, 300 N.C. 557, 270 S.E.2d 109 (1980); *McBride v. Magnuson*, 282 Or. 433, 578 P.2d 1259 (1978); *Marshall v. Wilson*, 616 S.W.2d 932 (Tex.1981) (concurring opinion).

We believe that recognition of such conduct as tortious will help to effect a speedy return of the child and result in better cooperation by potential third-party defendants seeking to avoid the suit. *Wood v. Wood*, 338 N.W.2d 123, 127 (Iowa 1983)

(citing P. Hoff, *Interstate Child Custody Disputes and Parental Kidnapping: Policy, Practice and Law* at 14–1 (1982)).[10] Based on the fact that it is a crime in this state to take a child from his or her lawful custodian and to deprive the lawful custodian of custody of a child, we recognize the tort of interference with the parent-child relationship set forth in Restatement (Second) of Torts § 700 (1977).

Having determined that the allegations in the complaint amount to an allegation of tortious conduct, we next examine whether the tort occurred in Colorado. The use of the term "tortious act" in the long-arm statute implies the total act embodying both the cause and its effect. *Vandermee v. District Court*, 164 Colo. 117, 433 P.2d 335 (1967). The concept of injury is an inseparable part of the phrase. Here, the mother is a Colorado resident. Jerritt also resided in Colorado, and would still reside here if he had not been abducted from this state and prevented from returning. The mother is entitled to legal custody of her son pursuant to a Colorado court order. Thus, the injury resulting from petitioners' actions manifests itself in Colorado. We have held that, for purposes of the long-arm statute, tortious conduct in a foreign state which causes injury in Colorado may be deemed to be an act committed in Colorado so as to satisfy the long-arm statute. *Scheuer v. District Court*, 684 P.2d 249 (Colo.1984); *Le Manufacture Francaise Des Pneumatiques Michelin v. District Court*, 620 P.2d 1040 (Colo.1980); *Jenner & Block v. District Court*, 197 Colo. 184, 590 P.2d 964 (1979); *Texair Flyers, Inc. v. District Court*, 180 Colo.

---

**10.** Comment a to section 700 provides:

Under the rule stated in this Section, an action may be maintained by the parent who is entitled to the custody of a minor child against one who by force abducts the child from its home, or one who induces the child to leave its home with knowledge that the parent has not consented. In the case of abduction, it is immaterial whether the child has left home without the parent's consent. The actor is liable under the rule stated in this Section whether he abducts the child from school or some other place to which the child has been sent by its parent, or whether he abducts the child from its home. So, too, the action can be maintained against one who, with knowledge that the child is away from home against the will of the parent, imprisons it or induces the child, whether by affording it employment or otherwise, not to return home. No action can be maintained, however, against one who merely gives shelter and sustenance to a child known by the actor to have left home without the parent's permission, if the child is not induced by other means to remain away from its home.

Restatement (Second) of Torts § 700 comment a (1977).

432, 506 P.2d 367 (1973); *Vandermee,* 164 Colo. 117, 433 P.2d 335. Accordingly, these allegations constitute a prima facie showing of a tortious act within the state for purposes of long-arm jurisdiction.

### B.

■ We next consider whether the exercise of personal jurisdiction over the petitioners is consistent with constitutional due process standards. The due process clause of the United States Constitution limits state power over a non-resident defendant by prohibiting the assertion of in personam jurisdiction unless that defendant has "certain minimum contacts with [the forum state] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Thus, the defendant must have sufficient contacts with the forum state so that it is reasonable to require the defendant to defend the suit in the forum state. *Id.* 326 U.S. at 317, 66 S.Ct. at 158–159. The concept of minimum contacts "protects the defendant against the burdens of litigating in a distant or inconvenient forum" while ensuring that "the States through their courts, do not reach out beyond the limits imposed on them by their status as co-equal sovereigns in a federal system." *Worldwide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). The nature of the due process inquiry requires that each case be examined on its specific facts to determine whether there are sufficient minimum contacts to justify the exercise of personal jurisdiction over the defendant. *Fleet Leasing,* 649 P.2d at 1079; *Le Manufacture,* 620 P.2d at 1047. "Whether sufficient contacts exist to support jurisdiction over a non-resident defendant depends upon the quality and nature of the defendant's activity in the forum state." *Le Manufacture,* 620 P.2d at 1044 (citing *Hansen v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

■ This case was brought under the tort provision of the long-arm statute. Frequently, the commission of a tort, in itself, creates a sufficient nexus between the defendant and the state so as to satisfy the due process inquiry. In such cases there is no need to further engage in a minimum contacts analysis, because the defendant is so connected with the forum state that traditional notions of fair play and substantial justice are not offended by the state's exercise of jurisdiction. *See, e.g., Jenner & Block v. District Court,* 197 Colo. 184, 590 P.2d 964 (1979); *Texair Flyers v. District Court,* 180 Colo. 432, 506 P.2d 367 (1973); *see also McAvoy v. District Court,* 757 P.2d 633, 635 n. 3 (Colo. 1988). In addition, a defendant can reasonably foresee being haled into court to answer for his tortious conduct. In other cases, even if an injury is sustained in the forum state, the defendant's tortious acts may be so remote as to require a closer nexus between the defendant and the state. In such a case, a court must engage in a complete minimum contacts analysis. *See, e.g., Scheuer v. District Court,* 684 P.2d 249 (Colo.1984); *Fleet Leasing, Inc. v. District Court,* 649 P.2d 1074 (Colo.1982).

Here, however, the complaint alleges the commission of an intentional tort. In such a case, the defendant's actions must have been intended to cause injury within a particular forum. The acts allegedly committed by the petitioners were directed at interfering with Jerritt's relationship with his mother, avoiding the dictates of the Colorado custody order, aiding in concealing Jerritt from his legal custodian, and preventing his return to Colorado. Thus, Colorado was the focal point of both the petitioners' actions and the effects of those actions.

The United States Supreme Court has addressed the issue of what contacts are necessary to satisfy due process in the context of an intentional tort. In *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the Court approved an "effects" test and held that where a defendant's intentional, and allegedly tortious, actions, taken outside the forum, are expressly directed at causing a harmful ef-

fect within the forum state, a sufficient nexus exists between the defendant and the state so as to satisfy due process. *See also Brainerd v. Governors of the Univ. of Alberta,* 873 F.2d 1257 (9th Cir.1989); *Burt v. Board of Regents of Univ. of Nebraska,* 757 F.2d 242 (10th Cir.1985); *D.J. Invs. v. Metzeler Motorcycle Tire Agent Gregg, Inc.,* 754 F.2d 542 (5th Cir.1985); *Stuart v. Federal Energy Sys.,* 596 F.Supp. 458 (D.Vt.1984); *Jenner & Block v. District Court,* 197 Colo. 184, 590 P.2d 964 (1979). As the *Calder* opinion points out, the defendant should reasonably anticipate being haled into court to answer for his intentionally tortious actions.

Consistent with the Court's analysis in *Calder,* we conclude that it does not offend notions of fair play and substantial justice to require the petitioners to defend against this lawsuit in Colorado. We therefore hold that the trial court had personal jurisdiction over petitioners based on those acts allegedly taken by them which were intended to cause injury in Colorado.

The judgment of the court of appeals is affirmed and the case is remanded to that court with directions to remand to the trial court for further proceedings consistent with this opinion.