**ARCHANGEL DIAMOND CORPORATION,**
Petitioner,

v.

**LUKOIL and Arkhangelskgeoldobycha,**
**Respondents.**

**No. 04SC455.**

Supreme Court of Colorado,
En Banc.

Nov. 21, 2005.

As Modified on Denial of Rehearing
Dec. 19, 2005.

Dorsey & Whitney, LLP., Tucker K. Trautman, Van Aaron Hughes, Denver, for Petitioner.

Davis Graham & Stubbs, LLP., M. Andrew Low, Tom McNamara, Anthony Shaheen, Denver, Winston & Strawn, LLP., Linda Coberly, Scott Glauberman, Chicago, IL, for Respondent, Arkhangelskgeoldobycha.

Rothgerber Johnson & Lyons, LLP., Frederick J. Baumann, Douglas B. Tumminello, Denver, for Respondent, Lukoil.

KOURLIS, Justice.

We granted certiorari to review the court of appeals' decision in *Archangel Diamond Corp. v. Arkhangelskgeoldobycha*, 94 P.3d 1208 (Colo.App.2004), in which that court held that a trial court addressing a C.R.C.P. 12(b)(2) motion may decide disputed jurisdictional facts without holding an evidentiary hearing. We now conclude that a trial court may not decide material issues of disputed jurisdictional fact against a plaintiff without such a hearing. Our case law and rules indicate that a plaintiff must establish a prima facie case of personal jurisdiction to overcome a C.R.C.P. 12(b)(2) motion to dismiss. In order to rebut allegations of personal jurisdiction set forth in the complaint, the defendant may file affidavits. The plaintiff may file counter-affidavits. When competent evidence in the parties' affidavits is conflicting, the court must resolve the conflicts in favor of the plaintiff. The court may not resolve disputed issues of fact against the plaintiff absent an evidentiary hearing.

Applying that precept to this case, we conclude that the plaintiff made a prima facie showing of personal jurisdiction over one of the defendants, Lukoil, and that the trial court erred in resolving disputed issues of material fact against the plaintiff to conclude otherwise. As to the defendant Arkhangelskgeoldobycha, the plaintiff failed to make a prima facie showing of personal jurisdiction and the trial court therefore did not err in granting that defendant's motion to dismiss. We thus reverse in part, affirm in part and remand the case to the court of appeals to consider any remaining unaddressed issues raised on appeal to that court relating to Lukoil.

## I. Background and Proceedings Below

This case arises from a string of contracts entered into between the parties or their predecessors concerning the development of a Russian diamond deposit. Petitioner, Archangel Diamond Corporation ("Archangel"),

is a Canadian corporation whose principal place of business was in Colorado at the time this lawsuit was filed.[1] The Respondents, Arkhangelskgeoldobycha ("AGD") and Lukoil, are both Russian corporations with their principal places of business in Russia.

In 1993, Archangel and AGD entered into an agreement ("1993 Agreement") whereby Archangel would finance, and AGD would explore, the Arkhangelsk diamond deposit in northern Russia. If the exploration proved fruitful, the contract called for AGD to turn over the diamond license it obtained from the Russian government to a joint stock company to be formed by the parties. In turn, the joint stock company would develop the diamond deposit. The 1993 Agreement was both negotiated and executed in Russia and called for the resolution of any disputes arising from it to be arbitrated in Sweden pursuant to United Nations-approved rules.

The parties decided to create the joint stock company in 1994, in accordance with a joint activity agreement ("1994 Agreement") that was negotiated and executed in Russia and that provided that any disputes arising from it would be resolved in the Russian court system. The joint stock company itself was formed in accordance with Russian law.

Disputes arose between the parties in 1996 after the exploration revealed that the diamond deposit was worth billions of dollars. In 1998, Archangel moved its principal place of business from Canada to Colorado. Subsequently, and in accordance with the 1993 Agreement, Archangel initiated arbitration proceedings to resolve the contractual disputes in Sweden. Soon thereafter, in 1999, the parties attempted to resolve their disputes in a new contract ("1999 Agreement") which essentially reaffirmed the parties' original obligations under the earlier contracts. The 1999 Agreement failed to resolve the disputes, however, and Archangel brought suit in Denver District Court in November of 2001 on contract and tort theories after AGD allegedly failed to meet its contractual obligations.

AGD and Lukoil moved to dismiss under C.R.C.P. 12(b)(2). The trial court did not hold an evidentiary hearing. Rather, it ruled on the motions based only on the complaint and the affidavits submitted by the parties. After resolving certain disputed jurisdictional facts in favor of the defendants, the trial court granted the motions.

Archangel appealed. The court of appeals concluded that the trial court had weighed and resolved disputed jurisdictional facts without conducting a hearing, but held that the court was permitted to do so. *See Archangel Diamond Corp.*, 94 P.3d at 1216. Archangel subsequently petitioned for and we granted certiorari.

## II. Analysis

We granted certiorari to decide whether, when ruling on a C.R.C.P. 12(b)(2) motion, a trial court may weigh and resolve disputed jurisdictional facts without holding a hearing.[2] Archangel argues that its due process rights were violated when the trial court weighed and resolved disputed jurisdictional facts against it without first allowing discovery and conducting an evidentiary hearing. AGD counters that the trial court did not actually resolve any disputed material facts pertaining to its personal jurisdiction over them. Rather, AGD argues, the trial court found that the *undisputed* facts before it did not establish a prima facie showing of personal jurisdiction. Lukoil's argument is essentially the same as AGD's: that the trial court did not err by failing to hold an evidentiary hearing because there were no material disputed jurisdictional facts, and the undisputed jurisdictional facts did not add up to a prima facie showing of personal jurisdiction over it.

■ We conclude that a trial court must not weigh and resolve disputed facts raised in a 12(b)(2) motion unless it conducts an evidentiary hearing. We begin our analysis by clarifying the proper procedure for ad-

---

1. Archangel moved its principal place of business back to Canada in 2002.

2. We granted certiorari to consider:

Whether the court of appeals erred in concluding a trial court may decide a C.R.C.P. 12(b)(2) motion by weighing and resolving factual issues without an evidentiary hearing.

dressing a 12(b)(2) motion to dismiss. Next, in light of the proper procedure, we review de novo whether Archangel established the prima facie case of personal jurisdiction necessary to defeat AGD's and Lukoil's 12(b)(2) motions.

### Proper Procedure for Addressing a 12(b)(2) Motion

■ We begin by noting that C.R.C.P. 12(b)(2) is virtually identical to its federal counterpart. *See* F.R.C.P. 12(b)(2). As such, we may turn to federal precedent for guidance in clarifying our procedure for addressing a 12(b)(2) motion to dismiss. *Bd. of County Comm'rs v. Dist. Ct.,* 172 Colo. 311, 313, 472 P.2d 128, 129 (1970)(noting the similarities between C.R.C.P. 12(b) and F.R.C.P. 12(b)); *accord Benton v. Adams,* 56 P.3d 81, 86 (Colo.2002) (comparing C.R.C.P. 15(a) to F.R.C.P. 15(a)); *Leidy's v. H2O Eng'g, Inc.,* 811 P.2d 38 (Colo.1991)(using federal case law in analyzing C.R.C.P. 52).

■ In its discretion, a court may address a 12(b)(2) motion prior to trial based solely on the documentary evidence or by holding a hearing. *See FDIC v. Oaklawn Apartments,* 959 F.2d 170, 174 (10th Cir.1992); *Ten Mile Indus. Park v. W. Plains Serv. Corp.,* 810 F.2d 1518, 1524 (10th Cir.1987). These options are not mutually exclusive. *Data Disc, Inc. v. Sys. Tech. Assocs. Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977); *see Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 145 (1st Cir.1995). However, the plaintiff's burden of proof on the question of personal jurisdiction depends on the method the court employs to decide the 12(b)(2) motion. *Oaklawn,* 959 F.2d at 174; *see Boit v. Gar–Tec Prods. Inc.,* 967 F.2d 671, 676 (1st Cir.1992).

■ Where the court decides the motion only on the documentary evidence, the plaintiff need only demonstrate a prima facie showing of personal jurisdiction to defeat the

motion.[3] *Benton v. Cameco Corp.,* 375 F.3d 1070, 1074 (10th Cir.2004); *Oaklawn,* 959 F.2d at 174. A prima facie showing exists where the plaintiff raises a reasonable inference that the court has jurisdiction over the defendant. *See Keefe v. Kirschenbaum & Kirschenbaum, P.C.,* 40 P.3d 1267, 1272 (Colo.2002). Documentary evidence consists of the allegations in the complaint, as well as affidavits and any other evidence submitted by the parties. *OMI Holdings, Inc. v. Royal Ins. Co. of Canada,* 149 F.3d 1086, 1091 (10th Cir.1998); *Ten Mile,* 810 F.2d at 1524. Similar to the court's role in addressing a motion for summary judgment, a court addressing a 12(b)(2) motion on documentary evidence alone acts as a "data collector" and not a factfinder. *Foster–Miller,* 46 F.3d at 145; *see Leidy's,* 811 P.2d at 39. Accordingly, the allegations in the complaint must be accepted as true to the extent they are not contradicted by the defendant's competent evidence, and where the parties' competent evidence presents conflicting facts, these discrepancies must be resolved in the plaintiff's favor. *Foster–Miller,* 46 F.3d at 145; *Behagen v. Amateur Basketball Ass'n,* 744 F.2d 731, 733 (10th Cir.1984); *Leidy's,* 811 P.2d at 40. The purpose of the light prima facie burden of proof at this early stage of litigation is simply to screen out "cases in which personal jurisdiction is obviously lacking, and those in which the jurisdictional challenge is patently bogus." *Foster–Miller,* 46 F.3d at 145.

■ Where a trial court elects to resolve a 12(b)(2) motion by holding an evidentiary hearing, the plaintiff's burden increases. At that juncture, the plaintiff must establish jurisdiction by a preponderance of the evidence. *Id.; Oaklawn,* 959 F.2d at 174. When a court holds a hearing, it is the factfinder and is in a position to weigh and resolve any factual disputes pertaining to jurisdiction. *Foster–Miller,* 46 F.3d at 146;

---

**3.** Although a prima facie showing of personal jurisdiction is sufficient to overcome the 12(b)(2) motion, the plaintiff ultimately bears the burden of demonstrating personal jurisdiction by the close of trial by a preponderance of the evidence if the defendant raises the challenge again at that time (having timely raised the question already in the 12(b)(2) motion). *Oaklawn,* 959 F.2d at 174 (noting that "whatever degree of proof is

required initially, a plaintiff must have proved by the end of trial the jurisdictional facts by a preponderance of the evidence")(internal quotations and citations omitted).

Further, as discussed below, either in the alternative, or subsequent to a prima facie showing, the court may require the plaintiff to establish personal jurisdiction by a preponderance of the evidence at a hearing prior to trial.

*see Ten Mile,* 810 F.2d at 1524. To this end, the court has the power to control the scope of the hearing and any discovery that may be necessary to allow it to decide the question of personal jurisdiction fully. *Foster–Miller,* 46 F.3d at 146; *see Wenz v. Nat'l Westminster Bank, PLC,* 91 P.3d 467, 469 (Colo.App.2004)(holding regulation of discovery on jurisdictional issues is within the trial court's discretion).

 In deciding whether a hearing on the issue of personal jurisdiction is appropriate, the court must determine if the circumstances of a particular case indicate it is

> unfair to force an out-of-state defendant to incur the expense and burden of a trial on the merits in the local forum without first requiring more of the plaintiff than a prima facie showing of facts essential to in personam jurisdiction. A court may so determine, for example, when the proffered evidence is conflicting and the record is rife with contradictions, or when a plaintiff's affidavits are patently incredible.

*Foster–Miller,* 46 F.3d at 145–46 (quoting *Boit,* 967 F.2d at 676). To this end, a court may determine that an evidentiary hearing is warranted even if it has already determined that a plaintiff has made a prima facie showing of personal jurisdiction. *Id.* at 146; *see Data Disc,* 557 F.2d at 1285. The court should be wary of finally deciding the jurisdictional question at an evidentiary hearing where the jurisdictional facts are inextricably intertwined with the merits of the case, because doing so could endanger the plaintiff's substantive right to a jury trial. *Foster–Miller,* 46 F.3d at 146; *see* C.R.C.P. 16(d); *Schramm v. Oakes,* 352 F.2d 143, 149 (10th Cir.1965). Further, the parties must be aware that if the trial court does address the jurisdictional question at a hearing, any findings it makes could later have a preclusive effect against a party. *Foster–Miller,* 46 F.3d at 146.

The procedure outlined by the federal courts for addressing 12(b)(2) motions fur-

thers principles of "flexibility, judicial economy, and the preservation of substantial rights." *Anderson v. Am. Soc. of Plastic and Reconstructive Surgeons,* 807 P.2d 825, 827 (Utah 1990)(noting that the federal approach to addressing 12(b)(2) motions is motivated by a concern for these three factors). We conclude that the procedure also appropriately balances the interests of the litigants, and clarifies the trial court's role.

Hence, in summary, because the trial court here decided to address the C.R.C.P. 12(b)(2) jurisdictional challenge on the documentary evidence alone, the trial court's role was to determine whether the plaintiff successfully asserted a prima facie case of personal jurisdiction over each defendant. In making that assessment, the trial court was required to resolve any disputed issues of material jurisdictional fact in favor of the plaintiff. If the trial court determined that Archangel had made a prima facie showing of personal jurisdiction, the trial court could still, in its discretion, either hold an evidentiary hearing to resolve the issue fully prior to trial, or it could simply proceed to trial where, if the defendant again challenged the court's personal jurisdiction, Archangel would have to prove personal jurisdiction by a preponderance of the evidence.

## III. Application

### A. Requirements for Personal Jurisdiction

 A plaintiff seeking to invoke a Colorado court's jurisdiction over a non-resident defendant must comply with the requirements of our long-arm statute and constitutional due process. *See Keefe,* 40 P.3d at 1270. Because the General Assembly intended for our long-arm statute to confer the maximum jurisdiction permitted by the due process clauses of the United States and Colorado constitutions, we necessarily address the requirements of the long-arm statute when we engage in constitutional due process analysis.[4] *Id.; see Mr. Steak, Inc. v.*

---

4. Colorado's Long Arm Statute states, in pertinent part:

> Engaging in any act enumerated in this section by any person, whether or not a resident of the state of Colorado, either in person or

> by an agent, submits such person ... to the jurisdiction of the courts of this state concerning any cause of action arising from: (a) The transaction of any business within this

*Dist. Ct.,* 194 Colo. 519, 521, 574 P.2d 95, 96 (1978). In regard to personal jurisdiction, due process analysis involves an ad hoc evaluation of the facts of each case and is generally considered more of an art than a science. *Keefe,* 40 P.3d at 1272. However, this does not mean that due process analysis is discretionary. *Id.* Due process requires that a defendant have certain *minimum contacts* with the forum state so that he may foresee being answerable in court there. *See id.* at 1270–71. The quantity and nature of the minimum contacts required depends on whether the plaintiff alleges specific or general jurisdiction. *See id.* at 1271. Because Archangel asserts specific and general jurisdiction, we discuss both concepts below.

### 1. Specific Jurisdiction

▮▮▮ Specific jurisdiction is properly exercised where the injuries triggering litigation arise out of and are related to "activities that are significant and purposefully directed by the defendant at residents of the forum." *Id.* at 1271 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). As such, the minimum contacts inquiry in regard to specific jurisdiction is essentially a two part test assessing, (1) whether the defendant purposefully availed himself of the privilege of conducting business in the forum state, and (2), whether the litigation "arises out of" the defendant's forum-related contacts. *See id.* at 1270–71 (noting that due process analysis revolves around the defendant's "conduct and connection" with the forum state); *OMI Holdings,* 149 F.3d at 1091 ("Within [the minimum contacts] inquiry we must determine whether the defendant purposefully directed its activities at residents of the forum, and whether the plaintiff's claim arises out of or results from actions ... that create a substantial connection with the forum state.") (internal citations and quotations omitted); *see also Cameco Corp.,* 375 F.3d at 1078 (applying this two-part minimum contacts inquiry where both contract and tort claims asserted). The purposeful availment requirement precludes personal jurisdiction re-

sulting from "random, fortuitous, or attenuated contacts." *Bell Helicopter Textron, Inc. v. Heliqwest Intern., Ltd.,* 385 F.3d 1291, 1296 (10th Cir.2004) (quoting *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174); *Keefe,* 40 P.3d at 1271. Similarly, the actions of the defendant, and not those unilaterally taken by someone else, are significant in determining whether the defendant purposefully availed himself of the privilege of conducting business in the forum state. *Burger King,* 471 U.S. at 474–75, 105 S.Ct. 2174; *Keefe,* 40 P.3d at 1270; *see also Asahi Metal Indus. Co. v.Super. Ct. of California,* 480 U.S. 102, 109, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *OMI Holdings,* 149 F.3d at 1091. A defendant's deliberate creation of "continuing obligations" with the forum state has also been identified as a factor constituting purposeful availment. *Keefe,* 40 P.3d at 1271 (citing *Burger King,* 471 U.S. at 475–76, 105 S.Ct. 2174). As far as the "arising out of" prong of the specific jurisdiction test is concerned, the actions of the defendant giving rise to the litigation must have created a "substantial connection" with the forum state. *Id.; see OMI Holdings,* 149 F.3d at 1091.

### 2. General Jurisdiction

▮▮▮ Whereas specific jurisdiction requires that the cause of action arise out of the defendant's contacts with the forum, general jurisdiction permits a court to exercise jurisdiction over a defendant even where the litigation arises out of non-forum contacts. *Waterval v. Dist. Ct.,* 620 P.2d 5, 9 (Colo. 1980); *see OMI Holdings,* 149 F.3d at 1091. "However, because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts." *OMI Holdings,* 149 F.3d at 1091 (internal quotations omitted) (quoting *Metro. Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 567 (2d Cir.1996) ).

### 3. Reasonableness

▮▮▮ Once a plaintiff has established that a defendant has the requisite minimum

state; (b) The commission of a tortious act within this state ....

§ 13–1–124(1)(a)–(b), C.R.S. (2005).

contacts under either specific or general jurisdiction, "these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Keefe*, 40 P.3d at 1271 (internal quotations omitted) (citing *Burger King*, 471 U.S. at 476, 105 S.Ct. 2174). This inquiry "requires a determination of whether a district court's exercise of personal jurisdiction over a defendant with minimum contacts is 'reasonable' in light of the circumstances surrounding the case." *OMI Holdings*, 149 F.3d at 1091 (citing *Asahi*, 480 U.S. at 109, 107 S.Ct. 1026); *Keefe*, 40 P.3d at 1271. A court may consider several factors in determining whether the exercise of jurisdiction is proper, including the burden on the defendant, the forum state's interest in resolving the controversy, and the plaintiff's interest in attaining effective and convenient relief. *Keefe*, 40 P.3d at 1271–72. Where a defendant's minimum contacts with Colorado are weak, "the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of minimum contacts." *OMI Holdings*, 149 F.3d at 1092 (quoting *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir.1994)); *Keefe*, 40 P.3d at 1271–72.

## B. Specific Jurisdiction over AGD and Lukoil

We assess whether Archangel has established a prima facie showing of specific jurisdiction over AGD and Lukoil respectively. In doing so, we first set forth the jurisdictional allegations in the complaint, followed by the evidence set forth in the parties' affidavits. Finally, we analyze the jurisdictional facts presented and conclude that Archangel has failed to establish a prima facie showing of specific jurisdiction over both AGD and Lukoil. We review the documentary evidence de novo. *Foster–Miller*, 46 F.3d at 147; *Ten Mile*, 810 F.2d at 1524; *see In re Marriage of Malwitz*, 99 P.3d 56, 59 (Colo. 2004); *Bolser v. Bd. of Comm'rs*, 100 P.3d 51, 53 (Colo.App.2004).

### 1. AGD

In its complaint, Archangel alleges the following: that its principal place of business is in Colorado; that AGD directed numerous communications to Archangel in Colorado, including letters, faxes, and telephone calls; that AGD's communications to Archangel in Colorado concerned the parties' contractual agreements and were designed to facilitate an illegal scheme; that Archangel and AGD entered into the 1999 Agreement in an attempt to resolve their disputes; and that Archangel spent money in reliance on AGD's statements. The complaint also indicates that Archangel operates a Russian satellite office. Further, it alleges that the Russian court system is corrupt, and that the Russian and Canadian governments were both involved in attempting to resolve this dispute even after Archangel moved to Colorado.

AGD responds to Archangel's initial jurisdictional allegations with the affidavits of one of its lawyers and the deputy chairman of its board of directors. The affidavits show that Archangel has minimal business operations in Colorado. The affidavits also demonstrate that AGD is a Russian company to the extent that: it is incorporated under Russian law; it is the successor to a Russian state-owned enterprise; its principal place of business is in Russia; it is in the Russian oil, gas, and mining business; it conducts all sales and production activities in Russia; and all of its 4,500 employees live and work in Russia. Further, AGD demonstrates that its Colorado contacts are negligible to the extent that: it is not authorized to conduct business in Colorado; it has no agent designated to accept service in Colorado; it does not have any property interests of any kind in Colorado; it has not conducted any financial transactions in Colorado; and it has no assets of any kind here. Importantly, AGD also shows that the agreements from which the claims in this case arise were negotiated and executed in Russia and concern the mining of Russian diamonds, the formation of a Russian joint stock company, and the award and transfer of a diamond "license" issued by the Russian government. AGD also sets forth evidence that the parties agreed to arbitrate their disputes arising from the 1993 Agree-

ment in Sweden, and that any disputes arising from the 1994 Agreement were to be resolved in the Russian court system. AGD shows that Archangel has been a successful participant in lawsuits held in the Russian court system based on the same contracts at issue here. Additionally, AGD shows that much of the evidence needed for trial is located in Russia and is in the Russian language, and that many of the likely witnesses live and work in Russia.

Archangel controverts AGD's evidence with affidavits from two of its corporate officers. These affidavits set forth competent evidence establishing that its principal place of business was in Colorado beginning in January of 1998. Archangel's CEO also states that he "believe[s] that AGD effected a scheme, beginning in late 1995–early 1996, to deceive [Archangel] into believing that AGD would honor its obligations to [Archangel], when it had no intent to do so, in order to obtain financial and other benefits from [Archangel]." Additionally, Archangel provides competent evidence that it made several million-dollar payments from Colorado after relying on AGD's representations concerning the agreements.

Archangel also details the time frames and subject matter of approximately 13 of the 75 communications it received from AGD in Colorado. These communications, most of which are attached as exhibits, include: 1) a March 17, 1998, memorandum from an agent of AGD and Lukoil allegedly sent to Archangel in Colorado stating that AGD had no claims against Archangel, that all parties to the 1994 Agreement were planning on honoring it, and that both the 1993 and 1994 Agreements remained in full effect; 2) a letter dated April 3, 1998, which was "transmitted" to Archangel in Colorado by an agent of AGD and Lukoil, in which Lukoil's president, in what appears to be a response to a prior letter sent by Archangel, indicates that Lukoil "adheres to principles of continuity and execution of the previously concluded agreements," and "[it] conducts its business in connection with the purchase of equity in [AGD] while staying true to the very same principles"; 3) a March 5, 1998, letter by agents of AGD and Lukoil faxed to Archan-

gel in Colorado indicating that AGD "does not renounce (or withdraw from) the obligations" it has from the 1993 and 1994 Agreements; 4) a telephone call in May or June 1998, from Usmanov, who owned a part of AGD and was responsible for AGD's activities under the 1994 Agreement, to Archangel's CEO in Colorado indicating that "[Archangel's CEO] should meet with him in Moscow as soon as possible"; 5) a telephone call sometime during the week of May 25, 1999, from AGD's chairman indicating that Usmanov wanted to meet with Archangel's CEO to resolve their disputes relating to the 1993 and 1994 Agreements; 6) a July 23, 1999, letter from AGD's chairman, that was addressed and telecopied to Archangel's CEO in Colorado, indicating that AGD was in compliance with the 1999 Agreement and that they hoped that Archangel would also comply with the Agreement; 7) a July 27, 1999, letter from AGD's deputy general director and legal counsel, addressed and telecopied to Archangel's CEO in Colorado in response to a letter sent by Archangel, indicating *inter alia*, that it was in compliance with the 1999 Agreement and would continue to be; 8) phone calls from AGD and its agents from July to August of 1999, to the effect that AGD wanted to issue a joint press release announcing that an agreement had been reached and the diamond license would be transferred to the Russian joint stock company; 9) a letter of August 4, 1999, from AGD's deputy general director and legal counsel telecopied to Archangel in Colorado, in response to a letter and draft of a joint press release sent by Archangel to AGD, enclosing its own proposed joint press release to the effect that all parties would adhere to the 1999 Agreement; 10) an August 10, 1999, letter from AGD's deputy general director and legal counsel telecopied to Archangel in Colorado in response to an earlier letter sent by Archangel enclosing a modified draft of the joint press release stating that "[the 1999 Agreement] fully resolves all of the differences between the parties, and that it is binding and will be adhered to by all parties. Now, therefore, a conflict between AGD and Archangel is completely and fully behind us."; 11) an October 13, 1999, letter from AGD's chairman to Archan-

gel in Colorado in response to a fax received by Archangel, which states *inter alia*, that "[AGD] is starting to doubt whether it is any use to continue discussions on [disputed] issues," and that "[AGD] once again categorically [rejects] any and all claims that AGD violates the [prior agreements] and confirms our willingness and readiness to live by it. We express hope that we will encounter a similar reaction from [Archangel], this time not only in words."; 12) an open letter from AGD's chairman to shareholders dated January 26, 2000, and copied to Archangel, giving assurances that AGD would "fulfill everything necessary to achieve the purposes of the [prior agreements] and to transfer the [diamond license] to the joint legal entity."; 13) a letter of January 31, 2000, by AGD's general director in response to an earlier fax sent by Archangel stating that "AGD, using the latest changes in the Russian legislation, would be ready to transfer the [diamond] license to [the joint stock company] by way of addressing an appropriate application to the Ministry of Natural Resources of the Russian Federation, to the Administration of the Archangelsk Oblast, and to other relevant authorities."

■ From the above facts we discern factual disputes regarding the time period that Archangel had its principal place of business in Colorado, and whether Russia is a viable forum for trial. We must resolve these conflicts in Archangel's favor for purposes of the 12(b)(2) motion. Nonetheless, we conclude that AGD's communications with Archangel in Colorado do not raise the inference that Colorado has specific jurisdiction over AGD.

We note that Archangel attempts to subject AGD to jurisdiction in Colorado based on the approximately 75 communications from AGD to Archangel in Colorado. As we begin our review of these jurisdictional facts, it is perhaps most striking that the only reason AGD communicated with Archangel in Colorado at all was because Archangel unilaterally decided to move its principal place of business here. This is especially important in light of the fact that all of the 75 alleged communications by AGD to Colorado concern the resolution of disputes pertaining to the 1993 and 1994 Agreements. These contractual disputes did not arise when Archangel was a Colorado resident. To the contrary, the parties' contractual disputes arose in "late 1995–early 1996" when Archangel's principal place of business was in Canada. Under these circumstances, if we were to give significant weight to AGD's Colorado contacts alleged by Archangel, we would be condoning Archangel's tactic of essentially forcing AGD to subject itself to litigation in our courts if it in any way communicated with Archangel in Colorado in an attempt to resolve the parties' ongoing disputes that arose years earlier in a foreign jurisdiction. We cannot sanction the effects of such unilateral action on behalf of Archangel and we therefore find that the significance of AGD's contacts in relation to the agreements, all of them, is of much less weight accordingly.

We further note that the 1993 and 1994 Agreements, as well as the 1999 Agreement, do not show any purposeful availment on the part of AGD. It is undisputed that the contracts at issue here were negotiated and executed in Russia and pertain to the mining of diamonds on Russian soil, the creation of a Russian diamond-development company, and the award of a diamond "license" by the Russian government. Further, any disputes that arose from these contracts were to be resolved in Sweden pursuant to United Nations-approved rules or in the Russian court system. In this sense, none of the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing," *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 479, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), have anything to do with Colorado beyond the fact that Archangel's principal place of business was here beginning in 1998. This conclusion is buttressed by the fact that Archangel alleges in its complaint that it has a satellite office in Russia.

Based on the aforementioned analysis of the jurisdictional facts, we conclude that AGD's contacts with Archangel in Colorado are merely of the "random, fortuitous, or attenuated" nature and do not raise an inference that AGD purposefully availed itself of the privilege of conducting business here.

Archangel argues that our decision in *Waterval v. Dist. Ct.*, 620 P.2d 5 (Colo.1980), dictates a finding of specific jurisdiction over AGD. However, that case is distinguishable. *Waterval* involved an attorney/client relationship that began in Virginia and continued after the plaintiff moved to Colorado. 620 P.2d at 7. There, the client's claims arose almost entirely from an investment account that she opened while she was a Colorado resident, and the dispute did not arise until many years after the client had moved to Colorado. *Id.* Here, however, the vast majority of Archangel's claims pertain to contracts that were negotiated and executed in Russia while it was a Canadian resident. Also, Archangel moved to Colorado *after* disputes had arisen against AGD.[5] Further, although we note that Archangel entered into the 1999 Agreement with AGD while it was a Colorado resident, because that agreement concerns only the resolution of disputes arising in late 1995 from the pre-Colorado 1993 and 1994 Agreements, the 1999 Agreement does not create any continuing obligations independent from the Russian-focused earlier contracts.

Insofar as the "arising out of" prong of the specific jurisdiction inquiry is concerned, we conclude that Archangel has failed to raise an inference that AGD's actions giving rise to the litigation create a substantial connection with Colorado. As we pointed out earlier, it is undisputed that all of the 75 communications by AGD into Colorado concerned the 1993, 1994, and 1999 Agreements. That AGD's communications into Colorado were based on such Russian-oriented agreements portends a very slight nexus between AGD's communications to Archangel and Colorado. Further, the Russian and Canadian governments' involvement in the attempt to resolve this dispute even *after* Archangel moved to Colorado reflects the nature of Archangel's claims and the extent to which they did not really arise out of AGD's contract-related communications to Archangel in Colorado.

In its attempt to subject AGD to the jurisdiction of the Colorado courts, Archangel relies on two Colorado cases holding that, "where a defendant's intentional, and allegedly tortious, actions, taken outside the forum, are expressly directed at causing a harmful effect within the forum state, a sufficient nexus exists between the defendant and the state so as to satisfy due process." *D & D Fuller CATV Constr. Inc. v. Pace*, 780 P.2d 520, 525–26 (Colo.1989)(interpreting *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)); *Classic Auto Sales, Inc. v. Schocket*, 832 P.2d 233 (Colo.1992). As such, Archangel contends that its allegations of AGD's fraudulent conduct, in combination with AGD's alleged contacts set forth in the complaint and affidavits, are sufficient to invoke the jurisdiction of the Colorado courts over AGD. We disagree with Archangel under these circumstances.

*D & D Fuller* involved husband and wife Colorado residents who filed for divorce. 780 P.2d at 521–22. During the divorce proceedings, the wife obtained a restraining order against the husband that prevented him from seeing the couple's son. *Id.* at 521. The husband subsequently kidnapped the son and went into hiding. *Id.* The husband's parents played an active role, both individually and as agents of their company, in concealing the whereabouts of the husband and son from the authorities, incurring several contacts with various Colorado state agencies, banks, businesses, and residents. *Id.* at 521–23. There were allegations that the husband's mother made threatening phone calls into Colorado and that the husband's father was in Colorado at some point. *Id.* at 522. In determining that it was consistent with due process to subject the husband's parents and their company to Colorado's jurisdiction we held:

> The acts allegedly committed by the petitioners were directed at interfering with [the child's] relationship with his mother, avoiding the dictates of the Colorado restraining order, aiding in concealing [the child] from his legal custodian, and preventing his return to Colorado. Thus, *Colorado was the focal point of both the peti-*

---

5. By deciding today that *Waterval*, 620 P.2d 5, is distinguishable from the facts of this case, we in no way foreclose the possibility that other situa-

tions might arise where *Waterval* would operate to confer personal jurisdiction over a nonresident defendant.

*tioner's actions and the effects of those actions.*

*Id.* at 525 (emphasis added).

*Classic Auto Sales,* announced three years after *D & D Fuller,* involved a Colorado plaintiff who purchased a car based on an ad he saw in two nationally circulated magazines. 832 P.2d at 234. After engaging in four or five telephone calls with the Nebraska defendant, plaintiff purchased the car based on defendant's representations about it. *Id.* Several months after he bought it, the plaintiff discovered that the car was not the model represented by the defendant and brought suit alleging fraud, concealment, negligent misrepresentation, and deceptive trade practices. *Id.* at 235. Relying on *D & D Fuller,* we determined that "the alleged telephone conversations, especially taken together with the magazine advertisements, were sufficient minimum contacts to subject the defendants to jurisdiction of Colorado courts" in light of the "effects" that the Colorado plaintiff suffered here. *Id.* at 237 (internal quotations omitted).

Both *D & D Fuller* and *Classic Auto Sales* are based on the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In *Calder,* a California resident sued two Florida resident employees of the National Enquirer in California court alleging libel, intentional infliction of emotional harm, and invasion of privacy. *Id.* at 785–86. The Supreme Court concluded that the defendants' California contacts were sufficient to meet the minimum contacts requirement of due process. *Id.* at 788–89. The Court determined:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms of both emotional distress and the injury to [the plaintiff's] professional reputation, was suffered in California.

*Id.* After noting that California was both the focal point of the libelous story and of the harm suffered, the court held that California could properly exercise jurisdiction over the Florida defendants "based on the 'effects' of their Florida conduct in California." *Id.* at 789.

Contrary to Archangel's contention, we cannot conclude that the rule set forth in *Calder* and applied in *D & D Fuller* and *Classic Auto Sales* allows an exercise of personal jurisdiction over AGD in these circumstances. Rather, we agree with the Tenth Circuit Court of Appeals' analysis of a similar factual setting in *Far West Capital, Inc. v. Towne,* 46 F.3d 1071 (10th Cir.1995).

There, Towne, the defendant and a Nevada resident, owned property in Nevada that the Utah plaintiff, Far West Corporation, had an interest in developing. *Id.* at 1073. The negotiations took place in Nevada, but Towne sent several communications, including letters and faxes, to Far West in Utah. *Id.* The parties also set up an escrow account in Utah. *Id.* As the negotiations progressed, Towne also hired a Utah resident as her consultant, who in addition to lending his expertise about geothermal resources, picked up drafts of leases from Far West in Utah and forwarded the drafts to Towne. *Id.* Towne and Far West eventually entered into a lease agreement which required that any disputes arising from the contract be governed by Nevada law. *Id.* Shortly after entering into the agreement, Far West negotiated a sub-lease with a third party to build a power plant on the property. *Far West,* 46 F.3d at 1074. As part of the financing arrangement relating to the sublease, the third party required certain stipulations between Far West and Towne. *Id.* After Towne refused to agree to certain stipulations, Far West brought suit in Utah federal court alleging breach of contract and several business torts including bad faith breach of contract, intentional interference with contractual relations, and economic duress. *Id.*

In analyzing the "effects" test set forth in *Calder,* after reviewing several post-*Calder* decisions, the *Far West* court concluded:

> [T]he mere allegation that an out-of-state defendant has tortiously interfered with contractual rights or has committed other business torts that have allegedly injured a forum resident does not necessarily estab-

lish that the defendant possesses the constitutionally required minimum contacts. Instead, in order to resolve the jurisdictional question, a court must undertake a particularized inquiry as to the extent to which the defendant has purposefully availed itself of the benefits of the forum's laws.

*Id.* at 1079. Applying this narrow interpretation of the *Calder* "effects" test, the court of appeals affirmed the district court's conclusion that the exercise of Utah's jurisdiction over Towne would violate due process even though Far West alleged intentional torts and that it suffered injury in Utah. *See id.* at 1075. Specifically, the Tenth Circuit concluded that, unlike the situation in *Calder*, Towne's actions were not "expressly aimed at" Utah and Utah was not the "focal point" of the tort and its injury. *Far West*, 46 F.3d at 1080. The court summarized the circumstances in that case by noting, "[i]n short, there is no indication that Utah had anything but a fortuitous role in the parties' past dealing or would have any role in their continuing relationship." *Id.*

The narrow reading given by the Tenth Circuit to the *Calder* "effects" test is compatible with the due process inquiry that has traditionally focused on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). Such a construction mandates an inquiry "as to the extent to which the defendant has purposefully availed itself of the benefits" of Colorado's laws. *Far West*, 46 F.3d at 1079.

Applying this principle to our case, our analysis leads us to conclude that AGD has not purposefully availed itself of the privilege of conducting business in Colorado.[6] AGD's attenuated and fortuitous contacts, coupled with the remote nexus between AGD's Colorado contacts and this litigation, fail to raise an inference of specific jurisdiction over AGD.

### 2. Lukoil

Archangel's complaint alleges that Lukoil directly or indirectly controlled a company that managed AGD at all relevant time periods, and that Lukoil's agents directed AGD to make the aforementioned communications into Colorado.

Lukoil challenges Archangel's allegations of personal jurisdiction with the affidavits of various employees, which provide competent evidence that Lukoil did not acquire any interest in AGD until March 30, 2001.

In an effort to establish a prima facie showing of specific jurisdiction over Lukoil, Archangel again relies on the affidavits of its corporate officers, which provide competent evidence that Lukoil obtained control of AGD as early as December 1997. Archangel's evidence also shows that many of Lukoil's former employees became members of AGD's board of directors soon thereafter.

Based on the pleadings and evidence, it appears that Archangel attempts to assert specific jurisdiction over Lukoil based on the principle that AGD was acting as its agent. However, without deciding whether this tactic is legally sound, we conclude that since Archangel has failed to establish a prima facie showing of specific jurisdiction over AGD, Archangel has also failed to demonstrate a prima facie showing of specific jurisdiction over Lukoil.

### C. General Jurisdiction over Lukoil

██ Although Archangel fails in its attempt to establish a prima facie showing of specific jurisdiction over Lukoil, we find that it has raised a reasonable inference of general jurisdiction over Lukoil. Archangel sets forth facts in its complaint showing that Lukoil operates a gas station in Colorado. Archangel also alleges that Lukoil has entered into a variety of agreements with Colorado companies to provide Lukoil with engineering services.

Lukoil rebuts the allegation that it has contracted with several Colorado engineering firms through the affidavits of some of its

---

**6.** We further note that this is a two-prong test, and even if the first prong were satisfied, the second one is not in that we have determined

that Archangel's claims do not meet the "arising out of" prong of the minimum contacts inquiry.

employees. These affidavits also show that Lukoil is a Russian company with its principal place of business in Russia, and that it has never entered into any contracts with Archangel or any other entity located in Colorado. Lukoil further demonstrates that it is not registered to do business in Colorado, and that it has no offices, employees, agents, or any business interests here. Lukoil also has never conducted any meetings here, nor does it own any property in Colorado. Additionally, through the affidavit of the former advisory director of a company called Nexus Fuels, Inc., Lukoil provides competent evidence that the Glendale, Colorado, gas station at issue was, essentially, never owned or controlled by Lukoil.

Relying on the affidavit of its CEO, Archangel provides competent evidence that Lukoil is active in the retail gas industry in Colorado. To support this contention, Archangel attaches a press release posted on the Lukoil website stating, in pertinent part, that "LUKOIL has become the first Russian oil company which in 1997 began to build its own gasoline filling stations in the USA. Today there are six stations in Colorado, Virginia, Mane [sic], and some other states." Archangel also submits photos of a gas station in Glendale, Colorado, on which Lukoil's logo is displayed prominently.

Based on Archangel's evidence showing that Lukoil essentially admitted to owning the Glendale gas station, as well as the evidence showing Lukoil's logo posted on the gas station, we conclude that Archangel established a prima facie showing of general jurisdiction over Lukoil.[7]

Lukoil argues that the mere display of a logo is not sufficient for a finding of a continuous and systematic business presence. We agree. However, for purposes of the 12(b)(2) motion, we find that the logo, taken with the other evidence showing that Lukoil operates a gas station in Colorado, raises an inference that Lukoil has a continued and systematic business presence here. In the 12(b)(2) sense, then, Archangel has demonstrated a prima facie showing of general jurisdiction over Lukoil.

Having decided that Archangel has established a prima facie showing of general jurisdiction over Lukoil, for purposes of the reasonableness inquiry, we conclude that this reasonable inference that Lukoil has a continuous and systematic business presence in Colorado makes it reasonable for that company to defend Archangel's claims here. Therefore, having satisfied the due process inquiry, Archangel has successfully defeated Lukoil's 12(b)(2) challenge to Colorado's personal jurisdiction over that company.

## IV. Conclusion

A trial court may not resolve material disputed issues of jurisdictional fact raised in a 12(b)(2) motion without holding a hearing. Applying the proper procedure for addressing a 12(b)(2) motion without such a hearing, we hold that Archangel has failed to establish a prima facie case of specific jurisdiction over AGD and Lukoil. Archangel has, however, demonstrated a prima facie showing of general personal jurisdiction over Lukoil. Accordingly, we affirm in part and reverse in part the judgment of the court of appeals and remand to that court to consider any other remaining unaddressed issues raised on appeal relating to Lukoil.

Justice BENDER does not participate.

---

**7.** To the extent ownership of the gas station is disputed, our conclusion reflects the resolution of this issue in Archangel's favor for purposes of the 12(b)(2) motion at this stage.