The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
August 5, 2021

## 2021COA105

## No. 20CA0668, *Walker v. Women's Professional Rodeo Association* — Business Organizations — Nonprofit Corporations — Business Judgment Rule

A division of the court of appeals considers whether members of a

nonprofit corporation that is a membership association are entitled

to judicial review of the corporate board's interpretation and

application of the corporation's internal rules. The division

concludes that, in the absence of allegations of fraud, arbitrary

conduct, or bad faith, such judicial review is barred by the business

judgment rule. The division also determines that although the

district court correctly dismissed the appellants' claims under

C.R.C.P. 12(b)(5) and awarded mandatory attorney fees to the

appellees under section 13-17-201, C.R.S. 2020, it erred by

declining to hold a hearing on the reasonableness of such fees when

such a hearing was timely requested by the appellants.

Court of Appeals No. 20CA0668
El Paso County District Court No. 19CV32217
Honorable Thomas K. Kane, Judge

Mary Walker and Carley Cervi,

Plaintiffs-Appellants,

v.

Women's Professional Rodeo Association, Inc.; Doreen Wintermute, in her official capacity as Chief Executive Officer; and Sheridan-Wyo-Rodeo, Incorporated,

Defendants-Appellees.

---

JUDGMENT AFFIRMED, ORDER AFFIRMED IN PART,
REVERSED IN PART, AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE LIPINSKY
Harris and Davidson*, JJ., concur

Announced August 5, 2021

---

Kathie Troudt Riley, P.C., Kathie Troudt Riley, Loveland, Colorado, for Plaintiffs-Appellants

Burns, Figa & Will, P.C., Dana L. Eismeier, Erik K. Schuessler, Greenwood Village, Colorado, for Defendant-Appellee Women's Professional Rodeo Association

Mulliken Weiner Berg & Jolivet P.C., Murray I. Weiner, Colorado Springs, Colorado, for Defendant-Appellee Doreen Wintermute

Sparks Willson, P.C., Eric V. Hall, Scott W. Johnson, Colorado Springs, Colorado, for Defendant-Appellee Sheridan-Wyo-Rodeo, Incorporated

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1     Alexis de Tocqueville's observation about Americans' propensity to form associations rings just as true today as it did more than 180 years ago:

> Americans of all ages, all stations in life, and all types of disposition are forever forming associations.  There are not only commercial and industrial associations in which all take part, but others of a thousand different types — religious, moral, serious, futile, very general and very limited, immensely large and very minute.

Alexis de Tocqueville, Democracy in America 513 (J.P. Mayer ed., George Lawrence trans., Anchor Books 1969).  And many of our nation's associations have adopted rules to govern themselves.

¶ 2     Although associations have long been deeply ingrained in American culture, in this case we decide a novel issue under Colorado law: whether members of an association — here a nonprofit corporation — may obtain a legal remedy against the association's board of directors when the board allegedly violates the association's rules to the members' detriment.

¶ 3     Plaintiffs, Mary Walker and Carley Cervi, are professional barrel racers.  Barrel racing is a timed rodeo event in which the participant, usually a woman, must guide her galloping horse

1

through a complete circle around each of three barrels, creating a cloverleaf pattern, and back to the starting point. *Cooper v. Comm'r*, No. 16331-04S, 2005 WL 1693673, at *1 n.3 (T.C. July 21, 2005) (unpublished opinion) (not precedential pursuant to I.R.C. § 7463(b)).

¶ 4 The Women's Professional Rodeo Association, Inc. (the WPRA), was founded in 1948 as a Colorado nonprofit corporation for, among other purposes, organizing female professional rodeo contestants and setting standards for "cowgirl events." The WPRA adopted approximately 200 pages of rules, including rules addressing its internal governance and the procedures at rodeo events in which its members participate. WPRA, 2019 Official Rule Book for the Women's Professional Rodeo Association (Dec. 2018), https://perma.cc/MJU8-2EAV (the Rules).

¶ 5 Walker and Cervi — members of the WPRA — dispute the WPRA's interpretation of the Rules applicable when a majority of contestants who registered for barrel racing at a rodeo do not compete because of dangerous arena conditions. Walker and Cervi are two of the riders who competed in barrel racing at the Sheridan, Wyoming, rodeo (the Rodeo) in 2019. Most of the other contestants

2

did not compete in barrel racing at the Rodeo because, the day before the official start date of the Rodeo, the judges declared the arena conditions dangerous as a result of heavy rains.

¶ 6    Walker and Cervi filed this case against the WPRA; Doreen Wintermute in her official capacity as chief executive officer of the WPRA; and Sheridan-Wyo-Rodeo, Incorporated (Sheridan Incorporated), the organizer of the Rodeo, after the WPRA did not pay Walker and Cervi the prize money to which they claim they were entitled after they finished in first and second place, respectively, in barrel racing conducted at the Rodeo after the arena conditions improved.  They appeal the district court's orders dismissing their claims for failure to state a claim upon which relief can be granted and awarding attorney fees to the WPRA and Wintermute without a hearing.

¶ 7    We affirm the district court's entry of judgment in favor of the WPRA, Wintermute, and Sheridan Incorporated and its ruling that the WPRA and Wintermute are entitled to recover attorney fees. However, we reverse the court's award of a specific amount of attorney fees and remand the case to the district court to conduct a

hearing on the reasonable amount of attorney fees awardable to the WPRA and Wintermute.

¶ 8     Before we turn to the facts underlying Walker and Cervi's claims, we review the Rules applicable to this case.

## I.     The Applicable Rules

¶ 9     Under the Rules, a barrel racer competing at a WPRA-sanctioned rodeo may participate in either "barrel racing slack" or regularly scheduled performances.  *See* Rule 12.6.  The "slack" consists of barrel races scheduled before or after the regularly scheduled performances.  Rule 12.6.1.  The record indicates that a racer cannot compete in both the "slack" and the regularly scheduled performances.

¶ 10    Rodeo organizers offer "added money" to attract contestants to participate in their rodeos.  *See* Rule 10.1.6-10.  The prize money "pot" awarded to barrel racers at a rodeo consists of the contestants' entry fees plus any added money.  In addition to prize money, a contestant in a WPRA-sanctioned barrel race can earn points.  Rule 15.  Upon reaching specified point totals, a racer qualifies for events at future rodeos.  Rule 15.1.

¶ 11    The Rules provide an alternate payout system for barrel racing contestants when a barrel race is canceled due to dangerous conditions.  Under Rule 10.9, known as the "day money" rule,

> if barrel race is cancelled after some have competed due to dangerous conditions, the event may be paid off using the day money system in order not to sacrifice money won at that rodeo or event.
>
> . . . .
>
> In the case of cancellation of an event . . . if half or more of the contestants competed, then all added money plus applicable entry fees are to be paid out to those contestants and points will count.  If less than half compete, a prorated portion of the added money plus applicable entry fees are to be paid out and only those points will count.

Rule 10.9.1, 10.9.3.  If the day money rule applies, each contestant who competed in "barrel race," as that term appears in the day money rule, receives the same payout, based on the formula in the rule, regardless of her performance.  Rule 10.9.2.  The day money rule does not specify whether "barrel race" refers to a single event or all the barrel races conducted at a rodeo.

¶ 12    The Rules also contain a grievance procedure if a WPRA member believes the WPRA, its board of directors, or an individual

5

director violated the Rules "due to an official act or failure to act." Rule 1.4.2. The Rules specify that a member must submit any grievance in writing to the WPRA's board of directors. *Id.* The board will then "determine the correctness of the grievance" at its next regular meeting, which the complaining member may attend. *Id.*

¶ 13 The Rules also contain an appeal procedure. If a member is dissatisfied with the board's resolution of her grievance, she may submit a written appeal to the board. *Id.* As part of her appeal, she may present any "new data or evidence" and "any new witnesses" at the board's next regular meeting. *Id.* The Rules do not specify every procedural step applicable to grievances and appeals.

¶ 14 Significantly, the Rules grant the WPRA board discretion in operating the organization and applying the Rules. Rule 4.1.2 states that "[t]he Board of Directors shall have discretionary power to conduct the business and affairs of the WPRA . . . ."

## II. Background Facts

¶ 15 Walker and Cervi registered to compete in WPRA-sanctioned barrel racing at the Rodeo, scheduled for July 10 through 13, 2019. Because the WPRA sanctioned the event, contestants could earn

6

both prize money and points. Sheridan Incorporated contributed $12,000 in "added money" to the "pot." Nearly 150 barrel racers registered to compete at the Rodeo. Approximately 100 of them were slated to race in the "slack" and forty-eight were scheduled to race in the regularly scheduled performances. The barrel racing at the Rodeo was to take place in an open-air arena.

¶ 16     The "slack" took place the day before the official start date of the Rodeo. The area had experienced heavy rains that day, however, and the arena was muddy. Before the "slack," approximately forty-five of the contestants announced that they would not compete.

¶ 17     Thirty-six other contestants showed up to compete in the "slack." But after only three contestants rode, the arena judges declared the ground conditions too dangerous for further racing and canceled the "slack."

¶ 18     The regularly scheduled performances at the Rodeo took place over the next several days; by then, the arena conditions had improved. Walker took first place and Cervi took second in the regularly scheduled performances.

¶ 19    Walker and Cervi alleged that, following the cancellation of the "slack," a WPRA executive consulted with a Sheridan Incorporated representative and the arena judges and decided to refund the entry fees paid by those barrel racers who were present and prepared to compete at the Rodeo. Walker and Cervi further allege that the WPRA directors on the WPRA's Competition Committee voted not to count the points earned by the barrel racers who competed at the Rodeo and to reduce the "added money" awardable for participation in the Rodeo from $12,000 to $4,000. This decision affected not only the contestants who had been prepared to race in the "slack," but also the contestants who competed in the regularly scheduled performance at the Rodeo.

¶ 20    A few days after the Rodeo, the WPRA published a "Payout Update" advising its members that, rather than the original advertised payout, which included the $12,000 "added money," the barrel racers who registered for the Rodeo would each receive an equal sum of money pursuant to the day money rule. The Payout Update also said that any points earned at the Rodeo would not be counted.

¶ 21    Walker and Cervi alleged this was the first time they learned they would not be receiving the payouts and points they expected to receive for their performances at the Rodeo.  Under the reduced payouts announced in the Payout Update, Walker and Cervi each received $571.04, rather than $4,743.24 and $3,794.59, which they respectively would have earned if the day money rule had not applied.  Neither received points they could apply towards qualifying for future rodeos.

¶ 22    Walker and Cervi filed a grievance with the WPRA challenging the decisions to apply the day money rule, to refund the contestants' entry fees, and not to count the points they otherwise would have earned at the Rodeo.

¶ 23    The WPRA board of directors met telephonically to consider Walker and Cervi's grievance.  Although the board allowed Walker and Cervi to speak at the telephonic meeting, Walker and Cervi alleged that the board limited their presentation to thirty minutes, the board would not allow them to record the meeting, and the WPRA kept no record of the meeting.  The Rules are silent, however, on whether a member who speaks at a meeting regarding a

grievance is subject to a time limit or whether she may record the proceedings.

¶ 24     Following the telephonic meeting, the WPRA issued a "Payout Update — Revised," announcing that, while the barrel racing contestants at the Rodeo would still be paid pursuant to the day money rule, any points earned at the Rodeo would be counted.

¶ 25     Walker and Cervi filed an appeal with the WPRA board of directors. Walker and Cervi allege that the board told them they would not be allowed to call witnesses at, record the proceedings at, or bring a court reporter to the meeting. Other than the references to presenting "new data or evidence" and "new witnesses," Rule 1.4.2, however, the Rules do not address the procedures for reviewing an appeal.

¶ 26     Because of these restrictions, Walker and Cervi complained that the WPRA was denying them a meaningful appeal. The WPRA denied the appeal.

¶ 27     Walker and Cervi then filed suit against the WPRA, Wintermute, and other defendants not relevant to this appeal. In their complaint, Walker and Cervi alleged that the WPRA and Wintermute had engaged in ultra vires acts, breached their

fiduciary duty to Walker and Cervi, and breached a contract with them.

¶ 28    In their complaint, Walker and Cervi sought a declaratory judgment stating, in relevant part, that

(1)    the "Rodeo was not canceled";

(2)    the "[u]se of the day money system for payouts [at the Rodeo] was not authorized under the Rules";

(3)    Walker and Cervi were entitled to payouts of $4,743.24 and $3,794.59, respectively;

(4)    Walker "was unlawfully deprived of the opportunity to compete at the Wrangler Pro Rodeo Tour Finale";

(5)    Cervi "was entitled to compete at the Mountain States Circuit Finals Rodeo" based on the points she would have received for her performance at the Rodeo; and

(6)    Walker and Cervi "are entitled to an award of points corresponding to the payout to which they are entitled . . . ."

¶ 29    They further sought a mandatory injunction requiring the WPRA to credit Walker and Cervi with those points and to publicly announce, and specifically advise the other major rodeo-sanctioning association of, the corrected number of points awarded to Walker

11

and Cervi.  They also asked the court to appoint a receiver to manage the WPRA's affairs.

¶ 30    The WPRA moved to dismiss Walker and Cervi's complaint for failure to state a claim upon which relief can be granted pursuant to C.R.C.P. 12(b)(5).  Together with their response to the dismissal motion, Walker and Cervi filed an amended complaint in which they added Sheridan Incorporated as a defendant and substituted a claim for judicial dissolution of the WPRA in place of the ultra vires acts claim.  The WPRA filed a motion to dismiss the amended complaint.

¶ 31    Wintermute and Sheridan Incorporated also filed motions to dismiss.  Wintermute's motion raised similar arguments to those in the WPRA's dismissal motions.  In its motion, Sheridan Incorporated contended that it was not subject to personal jurisdiction in Colorado.  In their dismissal motions, the WPRA and Wintermute sought an award of their attorney fees pursuant to section 13-17-201, C.R.S. 2020.

¶ 32    The district court granted all three motions to dismiss and awarded $18,748.00 in attorney fees to the WPRA and $11,445.50

in attorney fees to Wintermute without conducting a hearing on the reasonableness of such fees.  Walker and Cervi appeal.

## III.  Discussion

¶ 33     Walker and Cervi assert two principal errors on appeal.  First, Walker and Cervi contend that the trial court erred by granting the motions to dismiss.  For purposes of this appeal, Walker and Cervi challenge the court's determinations that

(1)     the WPRA did not act in an oppressive or illegal manner in applying the day money rule or in conducting the grievance process;

(2)     the WPRA does not owe fiduciary duties to its members;

(3)     a breach of contract claim against a nonprofit corporation cannot be based solely an alleged violation of its internal rules;

(4)     Walker and Cervi did not state a claim for injunctive relief;

(5)     they did not state a claim for dissolution of the WPRA or for appointment of a receiver;

(6)    they did "not allege any facts that raise a reasonable inference" that the court could exercise personal jurisdiction over Sheridan Incorporated;

(7)    Sheridan Incorporated is an indispensable party to the litigation;

(8)    Walker and Cervi's only claims pleaded against Wintermute were those for breach of fiduciary duty and breach of contract;

(9)    the Rules did not constitute a contract between Wintermute and the members of the WPRA; and

(10)  although Wintermute owes fiduciary duties to the WPRA, she does not owe such duties to the individual members of the WPRA.

¶ 34    Second, Walker and Cervi assert that the district court erred by (1) determining that their action sounded in tort and, thus, that the WPRA and Wintermute were entitled to an award of attorney fees under section 13-17-201 once the court dismissed Walker and Cervi's claims against them; and (2) declining to hold a hearing on the reasonableness of the WPRA's and Wintermute's requested attorney fees.

14

¶ 35    We affirm the district court's judgment in favor of the WPRA, Wintermute, and Sheridan Incorporated.  We specifically hold that Walker and Cervi's claims for breach of fiduciary duty, breach of contract, injunctive relief, and declaratory judgment are barred under the business judgment rule.  In addition, we hold that their claim for judicial dissolution fails because they did not allege the type of oppressive conduct necessary to obtain that drastic remedy.  We conclude, however, that, while an award of attorney fees to the WPRA and Wintermute is mandatory under section 13-17-201, the district court erred by awarding fees without holding a hearing on whether such fees were reasonable.  Thus, we reverse the district court's award of a specific amount of attorney fees to the WPRA and Wintermute, and remand with instructions for the district court to conduct such a hearing.

## A.    Standard of Review

¶ 36    We review de novo an order dismissing claims for failure to state a claim upon which relief can be granted under C.R.C.P. 12(b)(5).  *See Hess v. Hobart*, 2020 COA 139M-2, ¶ 11, 477 P.3d 771, 774.  "In doing so, we accept all factual allegations in the

15

complaint as true, viewing them in a light most favorable to the plaintiff." *Id.*

¶ 37    In *Warne v. Hall*, our supreme court adopted the United States Supreme Court's "plausibility standard" for determining whether a plaintiff stated a claim upon which relief can granted. 2016 CO 50, ¶ 24, 373 P.3d 588, 595 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Under that test, "the factual allegations of the complaint must be enough to raise a right to relief 'above the speculative level,' and provide 'plausible grounds'" to create an inference that the allegations are true. *Id.* at ¶ 9, 373 P.3d at 591 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 591 (2007)). "To survive a motion to dismiss for failure to state a claim, a plaintiff must state a claim for relief that is plausible (not speculative) on its face." *Hess*, ¶ 11, 477 P.3d at 774. If a claim does not satisfy the "plausible grounds" test, it must be dismissed for failure to state a claim upon which relief can be granted. *Warne*, ¶ 9, 373 P.3d at 591.

### B.    Interpretation of the WPRA's Rules

¶ 38    Each of Walker and Cervi's claims against the WPRA rests on, among other allegations, their contention that the WPRA failed to follow or misapplied certain of the Rules — most notably, the day

money rule and the Rules governing grievances and appeals. Walker and Cervi contend that the day money rule was inapplicable to the events at the Rodeo because the "barrel race" at the Rodeo had not been "canceled," as some of the contestants (including Walker and Cervi) were able to compete in the regularly scheduled performances. Under Walker and Cervi's reading of the day money rule, "barrel race" is canceled only if all barrel racing at a particular rodeo is canceled. They reason that the cancellation of the "slack" alone does not mean that "barrel race" at the Rodeo was "canceled."

¶ 39 As explained below, however, because Walker and Cervi's allegations center on the board's interpretation and application of certain of the Rules, and they do not allege fraud, arbitrariness, or bad faith, a court cannot interfere with the board's decisions. Accordingly, we agree with the district court that Walker and Cervi's claims against the WPRA do not meet the plausibility standard articulated in *Warne* and must be dismissed under C.R.C.P. 12(b)(5).

### 1. The Business Judgment Rule

¶ 40 Under the business judgment rule, "[t]he good faith acts of directors of profit or non-profit corporations which are within the

powers of the corporation and within the exercise of an honest business judgment are valid." *Rywalt v. Writer Corp.*, 34 Colo. App. 334, 337, 526 P.2d 316, 317 (1974). "Courts will not, at the instance of stockholders or otherwise, interfere with or regulate the conduct of the directors in the reasonable and honest exercise of their judgment and duties." *Id.* Because fraud, self-dealing, unconscionability, and similar conduct are "incompatible with good faith and the exercise of honest judgment," the business judgment rule does not shield the actions of directors who engage in this type of wrongful conduct. *Fletcher v. Dakota, Inc.*, 948 N.Y.S.2d 263, 267 (App. Div. 2012); *see Rywalt*, 34 Colo. App. at 337, 526 P.2d at 317 (holding that "[t]here being no evidence that the directors acted in bad faith or in fraud," the court would not interfere with the board's decision).

¶ 41    The business judgment rule rests on the "reality that courts 'are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments.'" *Curtis v. Nevens*, 31 P.3d 146, 151 (Colo. 2001) (quoting *Hirsch v. Jones Intercable, Inc.*, 984 P.2d 629, 638 (Colo. 1999)). Courts presume that a corporation's

directors possess the expertise and knowledge to make business decisions.

¶ 42    This presumption applies to voluntary membership associations, as well as to for-profit corporations. *Bloom v. Nat'l Collegiate Athletic Ass'n*, 93 P.3d 621, 624 (Colo. App. 2004) ("Courts are reluctant to intervene, except on the most limited grounds, in the internal affairs of voluntary associations."). "In the absence of some clearly arbitrary and unreasonable invasion of a member's rights, courts will not review the internal operation and affairs of voluntary organizations." *Jorgensen Realty, Inc. v. Box*, 701 P.2d 1256, 1258 (Colo. App. 1985); *see also NAACP v. Golding*, 679 A.2d 554, 561 (Md. 1996) (acknowledging that the rule "limiting courts' intervention in the internal disputes of unincorporated organizations absent misconduct like fraud is in essence analogous to the business judgment rule applicable to incorporated organizations").

2. Because Walker and Cervi Did Not Allege that the WPRA Engaged in Fraudulent or Similar Wrongful Conduct, the Courts Will Not Override the WPRA's Interpretation and Application of the Rules

¶ 43    Walker and Cervi did not plead that the WPRA engaged in the type of wrongful conduct that would justify disregarding the business judgment rule and would allow a court to second-guess the WPRA's internal decision-making. This is particularly true because the Rules at issue are either vague or susceptible of more than one interpretation and choosing one interpretation over another would favor certain members of the WPRA over other members.

¶ 44    In weighing the consequences of the judges' determination that the conditions for the "slack" at the Rodeo were dangerous, the WPRA board interpreted and applied Rules that leave room for interpretation. Specifically, the Rules do not state whether the day money rule applies when (1) the "slack" is canceled after some, but not all, registered competitors have raced in it; and (2) the regularly scheduled performance at the same rodeo then proceeds as scheduled. More generally, the Rules do not make clear whether "barrel race" can mean the "slack" alone or means all the barrel

20

racing conducted at a single rodeo. As noted above, the WPRA determined that the day money rule applies when, as here, the "slack" at a rodeo is canceled but the regularly scheduled performances at the same rodeo proceed.

¶ 45    Similarly, the board exercised its discretion when it decided that Walker and Cervi were not entitled to speak indefinitely about their grievance at the board meeting, receive a record of such proceedings, or present their appeal at a meeting of the board. Significantly, Walker and Cervi did not allege that the WPRA violated their due process rights by making these decisions.

¶ 46    These are archetypical examples of corporate board decisions that courts will not second-guess under the business judgment rule in the absence of allegations of fraud, arbitrary conduct, or bad faith. Moreover, although Walker and Cervi pleaded that, before the regularly scheduled performances at the Rodeo, unnamed WPRA board members advised unnamed "select competitors" — but not Walker and Cervi — that the WPRA would not count the points earned at the Rodeo, such vague allegations fall short of stating the type of wrongful conduct that would justify circumventing the business judgment rule. Notably, Walker and Cervi do not indicate

21

who disclosed this information, to whom the information was disclosed, or how the disclosure to the "select competitors" caused them damages. *See Grieveson v. Anderson,* 538 F.3d 763, 777-78 (7th Cir. 2008) (noting that "problematic for [the plaintiff was] his failure to tie actions of the named defendants to the injuries he allegedly suffered").

¶ 47 Moreover, the business judgment rule is particularly applicable to the WPRA board's interpretation of the day money rule because that interpretation benefited some of its members to the detriment of others. Had the WPRA decided not to apply the day money rule in connection with the Rodeo, Walker and Cervi would have benefitted through a larger payout and the WPRA members who did not compete at the Rodeo would have received nothing and lost their entry fees. In contrast, the WPRA's interpretation and application of the day money rule meant that each member who competed in barrel racing at the Rodeo received the same payout. Thus, numerous members of the WPRA, other than Walker and Cervi, benefitted from the WPRA's application of the day money rule. The Board decided, under its reading of the day money rule, to provide some financial recompense to those WPRA members who

22

were unable to compete at the Rodeo through no fault of their own. Jurists whose experience with barrel racing is limited to watching from the stands lack the expertise the WPRA possesses in deciding the appropriate payouts to the contestants who raced at the Rodeo and to those whose expectations were dashed when the "slack" was canceled.

¶ 48 We also note that, when they joined the WPRA, Walker and Cervi agreed to be bound by the Rules. *See Jorgensen Realty, Inc.*, 701 P.2d at 1257 (holding that, by joining a voluntary membership organization, "a member agrees to submit to its rules and regulations and assumes the obligations incident to membership"). Even if the business judgment rule did not apply here, as noted above, Rule 4.1.2 granted the WPRA board "discretionary power to conduct the business and affairs of the WPRA . . . ." Walker and Cervi cannot now disavow that Rule 4.1.2 grants the WPRA board the discretion to conduct the WPRA's business and affairs without judicial oversight in the ordinary course of business.

¶ 49 For the above reasons, we hold that the district court correctly concluded that Walker and Cervi's claims for breach of fiduciary duty, breach of contract, injunctive relief, and declaratory judgment

— all of which challenge the WPRA board's interpretation of the day money rule and the WPRA's internal procedures — fail to meet the plausibility standard under *Warne*. *See Colo. Homes, Ltd. v. Loerch-Wilson*, 43 P.3d 718, 724 (Colo. App. 2001) (applying the business judgment rule in a case involving claims for breach of contract and breach of fiduciary duty); *Rywalt*, 34 Colo. App. at 337, 526 P.2d at 317 (refusing to uphold an injunction because of the business judgment rule); *Romeo v. Barrella*, 921 N.Y.S.2d 83, 87-88 (App. Div. 2011) (affirming the dismissal of declaratory judgment claims based on the business judgment rule).

C.    Judicial Dissolution of a Nonprofit Corporation

¶ 50    Although we conclude that the business judgment rule precludes judicial review of the WPRA board's interpretation and application of the Rules, we separately review Walker and Cervi's claim for judicial dissolution of the WPRA and appointment of a receiver to conduct its affairs.  We conclude that the district court correctly dismissed their judicial dissolution and receivership claims because Walker and Cervi did not plead the type of wrongful board conduct that would justify granting such drastic relief.

### 1. Applicable Law

¶ 51    Under the Colorado Revised Nonprofit Corporation Act (NCA), a member of a nonprofit corporation may seek judicial dissolution of the corporation if the directors "have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent." § 7-134-301(2)(b), C.R.S. 2020.

¶ 52    Dissolution of a corporation is "a drastic remedy and [is] rarely imposed." *Pueblo Bancorporation v. Lindoe, Inc.*, 37 P.3d 492, 496 (Colo. App. 2001), *aff'd,* 63 P.3d 353 (Colo. 2003). Walker and Cervi do not cite to any Colorado case applying the remedy of judicial dissolution to an entity other than a closely held corporation. The only published Colorado cases affirming the judicial dissolution of an entity involved closely held corporations. *See Colt v. Mt. Princeton Trout Club, Inc.*, 78 P.3d 1115, 1118 (Colo. App. 2003); *Polk v. Hergert Land & Cattle Co.*, 5 P.3d 402, 404 (Colo. App. 2000). And even in the context of a closely held corporation, oppression "should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were

central to the [member's] decision to join the venture." *Colt,* 78 P.3d at 1120 (citation omitted).

2. The District Court Did Not Err by Concluding that Walker and Cervi Failed to State a Claim for Judicial Dissolution

¶ 53 Having concluded that the WPRA's interpretation and application of the Rules receives the protection of the business judgment rule, we consider whether Walker and Cervi's remaining allegations regarding the WPRA's failure to maintain records state a plausible claim for judicial dissolution under section 7-134-301(2)(b). Even accepting these allegations as true, we agree with the district court that the WPRA's alleged record-keeping deficiencies do not justify the extreme step of the WPRA's dissolution.

¶ 54 More fundamentally, Walker and Cervi do not point to a single case in which a court, based on oppressive behavior, judicially dissolved an entity that was not a closely held corporation. All the judicial dissolution cases they cite concerned oppressive conduct by majority shareholders of closely held corporations that harmed minority shareholders. *See Colt,* 78 P.3d at 1118; *Polk,* 5 P.3d at 404.

26

¶ 55 A closely held corporation is materially different from a nonprofit corporation that is a membership association, such as the WPRA, because, in the former, "the relationship between directors and shareholders is akin to a relationship among partners," such that the directors and majority shareholders owe heightened fiduciary duties to the minority shareholders. *Colt*, 78 P.3d at 1119; *see In re Kemp & Beatley, Inc.*, 473 N.E.2d 1173, 1178 (N.Y. 1984) ("Unlike the typical shareholder in a publicly held corporation, who may be simply an investor or a speculator and cares nothing for the responsibilities of management, the shareholder in a close corporation is a co-owner of the business and wants the privileges and powers that go with ownership." (quoting 1 F. Hodge O'Neal, Close Corporations: Law and Practice § 1.07 (2d ed. 1971))).

¶ 56 Walker and Cervi do not allege that the WPRA is a closely held corporation and do not cite any legal authority in support of their argument that the board of a membership association owes its members the same heightened duties as the majority shareholders of a closely held corporation owe to the minority shareholders.

¶ 57    In any event, we agree with the district court that, even if the board of directors of the WPRA owed fiduciary duties to Walker and Cervi, and even if the board's failure to maintain adequate corporate records could constitute a breach of fiduciary duty, a "simple allegation of breach of fiduciary duty is not enough to dissolve a corporation that is not closely-held."  Walker and Cervi do not cite to any case, from any jurisdiction, holding that a corporation's deficient record-keeping is grounds for judicial dissolution.  *See Pueblo Bancorporation*, 37 P.3d at 496 (holding that the "drastic remedy" of judicial dissolution is not justified absent allegations of self-dealing, conflicts of interest, misapplication or diminishing of corporate assets, or illegal behavior).

¶ 58    Accordingly, we hold that Walker and Cervi did not plead a plausible claim for judicial dissolution.  And, because the NCA only contemplates the appointment of a receiver in the context of a judicial dissolution claim, *see* §§ 7-134-302(3), 7-134-303(1), C.R.S. 2020, we need not separately consider whether Walker and Cervi's receivership claim stated a claim upon which relief can be granted.

## D. Personal Jurisdiction Over Sheridan Incorporated

¶ 59    To the extent Walker and Cervi seek unique relief from Sheridan Incorporated, such as an award of additional added money, we must consider whether the district court erred by concluding that it lacked personal jurisdiction over Sheridan Incorporated.  We undertake this analysis because the business judgment rule does not apply to Walker and Cervi's claims against Sheridan Incorporated.  As we understand those claims, they do not challenge Sheridan Incorporated's internal decision-making, but, rather, Sheridan Incorporated's actions taken at the behest of the WPRA board.

### 1. Personal Jurisdiction Under the Long Arm Statute

¶ 60    In enacting the long arm statute, § 13-1-124, C.R.S. 2020, the Colorado General Assembly "intended to extend the jurisdiction of our courts to the fullest extent permitted by the due process clauses of the United States and Colorado Constitutions." *Fleet Leasing, Inc. v. Dist. Ct.*, 649 P.2d 1074, 1078 (Colo. 1982).  "Due process requires that a defendant have certain minimum contacts with the forum state so that he may foresee being answerable in court there.  The quantity and nature of the minimum contacts

29

required depends on whether the plaintiff alleges specific or general jurisdiction." *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1194 (Colo. 2005) (citation omitted).

¶ 61　　Under the concept of general jurisdiction, a court may exercise jurisdiction over a defendant "for any cause of action arising from the defendant's activities, even if those activities occurred outside the forum state." *Clean Energy Collective LLC v. Borrego Solar Sys., Inc.*, 2017 CO 27, ¶ 10, 394 P.3d 1114, 1117. For a nonresident defendant to be subject to general jurisdiction in a particular state, the defendant's contacts with that state must be "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Magill v. Ford Motor Co.*, 2016 CO 57, ¶ 17, 379 P.3d 1033, 1037 (citation omitted). This is such a high bar, however, that a "nonresident defendant's contacts with the state will rarely justify exercising general jurisdiction." *Id.*

¶ 62　　In contrast, "[s]pecific jurisdiction is properly exercised where the injuries triggering litigation arise out of and are related to 'activities that are significant and purposefully directed by the defendant at residents of the forum.'" *Archangel Diamond Corp.*, 123 P.3d at 1194 (quoting *Keefe v. Kirschenbaum & Kirschenbaum,*

*P.C.*, 40 P.3d 1267, 1271 (Colo. 2002)). The specific jurisdiction analysis requires a two-part minimum contacts inquiry: (1) "whether the defendant purposefully availed himself of the privilege of conducting business in the forum state," and (2) "whether the litigation 'arises out of' the defendant's forum-related contacts." *Id.* (citation omitted). To demonstrate "purposeful availment," the plaintiff "must show that the defendant deliberately 'reached out beyond' its home — by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. ___, ___, 141 S. Ct. 1017, 1025 (2021). Under the "arising out of" prong, "the actions of the defendant giving rise to the litigation must have created a 'substantial connection' with the forum state." *Archangel Diamond Corp.*, 123 P.3d at 1194 (citation omitted).

¶ 63    "When a trial court decides [a] motion [to dismiss] on documentary evidence alone, the plaintiff need only make a prima facie showing of personal jurisdiction by raising a reasonable inference that the court has jurisdiction over the defendant." *Giduck v. Niblett*, 2014 COA 86, ¶ 13, 408 P.3d 856, 862. Any

conflicts in the evidence "must be resolved in favor of the plaintiff."

*Id.*

### 2. The District Court Did Not Err by Finding That Walker and Cervi Did Not Raise a Reasonable Inference of Jurisdiction Over Sheridan Incorporated

¶ 64 The district court concluded that Walker and Cervi's factual allegations and affidavits failed to establish that the court could exercise general or specific personal jurisdiction over Sheridan Incorporated. Specifically, the court found that

- Sheridan Incorporated is a Wyoming nonprofit corporation with its principal place of business in Wyoming.

- Sheridan Incorporated "does not have a registered agent, an office, a place of business, any assets, or any employees in Colorado."

- Sheridan Incorporated does not recruit Colorado residents, directly or through an intermediary in Colorado, for employment inside or outside of Colorado.

- Sheridan Incorporated does not directly advertise in Colorado.

- Sheridan Incorporated's sole purpose is to organize and run the Rodeo, which takes place in Wyoming.

- Sheridan Incorporated does not oversee any rodeos outside Wyoming and does not conduct any business outside Wyoming.

¶ 65    The court further noted that Walker and Cervi did not allege that Sheridan Incorporated does any business in Colorado or has any connection with Colorado other than its contract with the WPRA concerning the Rodeo.  Thus, it determined that Walker and Cervi's allegations did not raise a reasonable inference that it had specific or general jurisdiction over Sheridan Incorporated.

¶ 66    Applying the first step of the minimum contacts analysis for specific jurisdiction, a nonresident defendant is not subject to personal jurisdiction in Colorado solely because the defendant entered into a contract with a Colorado resident.  That singular connection, particularly in relation to an event outside Colorado, does not establish that the nonresident "reached out beyond" its own state to enjoy the benefits of conducting business in Colorado. *See Ford Motor Co.*, 592 U.S. at ___, 141 S. Ct. at 1025.

¶ 67    For this reason, Walker and Cervi's contention that Sheridan Incorporated subjected itself to specific personal jurisdiction in Colorado by entering into the contract with the WPRA cannot be squared with the minimum contacts analysis.  Rather, "the defendant's conduct [must] connect[] him to the forum in a meaningful way," *Giduck*, ¶ 16, 408 P.3d at 863 (citation omitted), such as by intentionally targeting the forum state market and its consumers, *see Ford Motor Co.*, 592 U.S. at ___, 141 S. Ct. at 1025. A "defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  *Giduck*, ¶ 16, 408 P.3d at 863 (citation omitted).

¶ 68    Thus, we conclude that Walker and Cervi's allegations did not create a reasonable inference that the district court could exercise personal jurisdiction over Sheridan Incorporated.  (Because we held above that the district court properly dismissed Walker and Cervi's only claims against the WPRA involving Sheridan Incorporated — their claims for a declaratory judgment and injunctive relief — we do not need to consider whether Sheridan Incorporated is an indispensable party to those claims.)

E.  Walker and Cervi's Claims Against Wintermute Fail to State Claims Upon Which Relief Can Be Granted

¶ 69    In considering whether the district court erred by dismissing Walker and Cervi's claims against Wintermute individually, we initially consider Walker and Cervi's contention that Wintermute admitted the allegations underlying their claims for judicial dissolution, declaratory judgment, injunctive relief, and appointment of a receiver by not specifically responding to them. We agree with the district court that Wintermute was not required to respond to these claims because they were not directed to her in an individual capacity.  Rather, Walker and Cervi's only claims against Wintermute individually were those for breach of fiduciary duty and breach of contract.

¶ 70    Neither of these claims stated a claim upon which relief can be granted against Wintermute, however.  The directors and officers of a nonprofit corporation "are not, as such, personally liable for the acts, debts, liabilities, or obligations" of the corporation. § 7-126-103, C.R.S. 2020.  Although there are exceptions to this rule, Walker and Cervi did not plead that any of these exceptions — such as the alter ego doctrine — applies here.  *See Krystkowiak v.*

*W.O. Brisben Cos., Inc.*, 90 P.3d 859, 867 n.7 (Colo. 2004). And, under the plausibility standard, we do not assume the truth of Walker and Cervi's conclusory statements that Wintermute acted in an illegal and oppressive manner and in bad faith, and that she breached a duty of loyalty to Walker and Cervi. *Scott v. Scott*, 2018 COA 25, ¶ 19, 48 P.3d 626, 632 ("[F]acts pleaded as legal conclusions (i.e., conclusory statements) are not entitled to the assumption that they are true.").

¶ 71 Further, to the extent Walker and Cervi allege that Wintermute misapplied the day money rule and the Rules concerning grievances and appeals, the business judgment rule bars such claims, as discussed above.

### F. Attorney Fees

#### 1. Mandatory Fee Awards Under Section 13-17-201

¶ 72 "Whether a statute mandates an award of costs or attorney fees is a question of statutory interpretation and is thus a question of law we review de novo." *Crandall v. City of Denver*, 238 P.3d 659, 661 (Colo. 2010).

### a. The Applicability of Section 13-17-201

¶ 73    Under section 13-17-201, an award of attorney fees to the defendant is mandatory whenever a trial court dismisses a tort action. § 13-17-201; *Kreft v. Adolph Coors Co.*, 170 P.3d 854, 859 (Colo. App. 2007). "When a plaintiff has pleaded both tort and non-tort claims, a court must determine, as a matter of law, whether the essence of the action was one in tort, in order to ascertain if section 13-17-201 applies." *Castro v. Lintz*, 2014 COA 91, ¶ 16, 338 P.3d 1063, 1068.

¶ 74    In making this determination the court should

> first apply the "predominance" test, assessing whether the "essence of the action" is tortious in nature (whether quantitatively by simple number of claims or based on a more qualitative view of the relative importance of the claims) or not. The Court would then turn to the question of whether tort claims were asserted to unlock additional remedies only where the predominance test failed to yield a clear answer, such as when the tort- and non-tort claims are equal in number or significance.

*Gagne v. Gagne*, 2014 COA 127, ¶ 84, 338 P.3d 1152, 1168. "[T]he court should rely on the pleading party's characterization of its

claims and should not consider what the party should or might have pleaded." *Id.* at ¶ 81, 338 P.3d at 1167.

   b.   Because Walker and Cervi's Claims Against the WPRA and Wintermute Sound in Tort, the District Court Did Not Err by Applying Section 13-17-201

¶ 75   In its order awarding attorney fees to the WPRA and Wintermute, the district court found that Walker and Cervi's breach of fiduciary allegations were "the essence" of their claims against the WPRA and Wintermute. Because a breach of fiduciary duty claim sounds in tort, *Resol. Tr. Corp. v. Heiserman*, 898 P.2d 1049, 1056 (Colo. 1995), the court reasoned that the WPRA and Wintermute were entitled to an award of their attorney fees and costs under section 13-17-201 upon the dismissal of all of Walker and Cervi's claims against them. We agree with the district court's conclusion.

¶ 76   According to *Gagne*, in determining whether the essence of Walker and Cervi's claims is in tort, we begin by evaluating the number and type of claims they asserted against the WPRA and Wintermute. We initially note that Walker and Cervi's claims for dissolution of the WPRA and appointment of a receiver are based on their allegations that the WPRA and Wintermute breached their

38

alleged fiduciary duties to Walker and Cervi and engaged in oppressive behavior. These claims sound in tort, regardless of how Walker and Cervi characterize them.

¶ 77 Thus, together with the separate claim for breach of fiduciary duty, the amended complaint contains three claims sounding in tort. *See Resol. Tr. Corp.*, 898 P.2d at 1056. The amended complaint contains an equal number of tort and non-tort claims because Walker and Cervi also asserted three non-tort claims — their breach of contract, injunctive relief, and declaratory judgment claims.

¶ 78 In this first step of the section 13-17-201 analysis, we may also consider the "relative importance of the claims." *Gagne*, ¶ 84, 338 P.3d at 1168 (citation omitted). Significantly, Walker and Cervi acknowledge that all their claims and all the relief they sought rested on the same allegations — that the WPRA and Wintermute engaged in wrongful conduct by reducing the prize money awardable to Walker and Cervi for their performances at the Rodeo. As described above, these allegations sound in tort.

¶ 79 Further, even if the first step of the *Gagne* analysis does not establish the essence of Walker and Cervi's claims, through their

breach of fiduciary duty, dissolution, and receivership claims, they attempted "to obtain relief beyond what was available solely under" their non-tort claims. *Crow v. Penrose-St. Francis Healthcare Sys.*, 262 P.3d 991, 997 (Colo. App. 2011). Walker and Cervi pleaded those claims to "unlock additional remedies," including the appointment of a receiver to supplant the WPRA's board and the most drastic possible remedy against a corporation — its destruction through judicial dissolution. It is too late for Walker and Cervi to contend that the essence of the case was merely their claim for money damages premised on the WPRA's alleged breach of contract.

¶ 80     For these reasons, we agree with the district court that Walker and Cervi's action sounds in tort and, under section 13-17-201, the WPRA and Wintermute are entitled to an award of their attorney fees.

2.     Hearing on Attorney Fees

a.     When a Hearing on Attorney Fees Is Required

¶ 81     "If a party requests a hearing concerning an award of fees, the trial court must hold a hearing." *Shyanne Props., LLC v. Torp*, 210 P.3d 490, 493 (Colo. App. 2009); *see* C.R.C.P. 121, § 1-22(2)(c)

("When required to do so by law, the court shall grant a party's timely request for a hearing."). "When a hearing is requested to determine the reasonableness and necessity of attorney fees, due process requires that the trial court hold such a hearing." *Roberts v. Adams*, 47 P.3d 690, 700 (Colo. App. 2001); *cf. Hendricks v. Allied Waste Transp., Inc.*, 2012 COA 88, ¶ 36, 282 P.3d 520, 527 (holding that "a bare statement" that the fees at issue are unreasonable does not entitle the party to a hearing).

b. The District Court Erred by Declining to Hold a Hearing on the WPRA's and Wintermute's Requests for Attorney Fees

¶ 82 We disagree with the district court's conclusion that a hearing on attorney fees was not necessary. Walker and Cervi timely requested a hearing on the WPRA's and Wintermute's requests for attorney fees and challenged the reasonableness of the amount of the requested fees. Specifically, Walker and Cervi raised factual issues concerning Wintermute's attorney fees request, such as whether Wintermute incurred attorney fees herself and whether Wintermute was seeking to recover attorney fees attributable to work for the WPRA or claims not applicable to Wintermute. Because, in opposing the WPRA's and Wintermute's fee request,

41

Walker and Cervi made a timely request for a hearing supported by more than a bare statement that the requested fees were unreasonable, we hold that the district court erred by declining to grant their request for a hearing on the reasonableness of the requested attorney fees.

¶ 83     The WPRA argues that Walker and Cervi were not entitled to a hearing because they did not submit an expert's affidavit together with their request for a hearing.  We are not persuaded.  Aside from timeliness, C.R.C.P. 121, section 1-22(c) does not mention any specific requirements for obtaining a hearing on the reasonableness of attorney fees.  The WPRA does not point us to any legal authority for limiting hearings on fees to situations in which the nonmoving party submitted an expert's affidavit.

¶ 84     Even though C.R.C.P. 121, section 1-22(2)(b) states that an attorney fee motion "shall be accompanied by any supporting documentation," including a fee agreement, this language does not require that "a written fee agreement or other materials evidencing the fee agreement . . . accompany a motion for attorney fees and costs," *Nesbitt v. Scott*, 2019 COA 154, ¶¶ 24-25, 30, 457 P.3d 134, 138-39.  If such expressly listed documentary support is not

required to file an attorney fee motion, they are surely not required to obtain a hearing on the motion. Moreover, such a requirement would be inconsistent with the requesting party's burden to "prove and establish the reasonableness of each dollar, each hour, above zero." *Payan v. Nash Finch Co.*, 2012 COA 135M, ¶ 35, 310 P.3d 212, 219 (quoting *Mares v. Credit Bureau*, 801 F.2d 1197, 1210 (10th Cir. 1986)). Thus, we conclude that the language of C.R.C.P. 121, section 1-22(2)(b) does not support the WPRA and Wintermute's contention that a request for a hearing on the reasonableness of attorney fees requires supporting documentation such as an expert's affidavit.

¶ 85    Finally, although the WPRA and Wintermute contend that the district court did not abuse its discretion by declining to hold a hearing "in the midst of the Coronavirus pandemic," the court did not cite the pandemic as a reason for not conducting the hearing.

¶ 86    Thus, we hold that the court erred by not granting Walker and Cervi's request for hearing on the reasonableness of the WPRA's and Wintermute's requested attorney fees.

## IV.    Appellate Attorney Fees

¶ 87    The WPRA, Wintermute, and Sheridan request the award of their appellate attorney fees.  Because we conclude that the district court properly dismissed Walker and Cervi's claims against each party under C.R.C.P. 12(b), "we must award attorney fees for successfully defending an appeal of those dismissed claims" under section 13-17-201.  *Duke v. Gunnison Cnty. Sheriff's Off.*, 2019 COA 170, ¶¶ 42-44, 456 P.3d 38, 46.

## V.    Conclusion

¶ 88    The judgment in favor of the WPRA, Wintermute, and Sheridan Incorporated, and the district court's ruling that the WPRA and Wintermute are entitled to attorney fees, are affirmed.  The WPRA, Wintermute, and Sheridan are awarded their reasonable attorney fees on appeal.  The district court's award of a specific amount of attorney fees to the WPRA and to Wintermute is reversed.  The case is remanded for the district court to hold a hearing on the amount of the WPRA's and Wintermute's reasonable attorney fees though this appeal and on the amount of Sheridan's reasonable attorney fees on appeal.

JUDGE HARRIS and JUDGE DAVIDSON concur.